Raymond RICHARDSON, Jr., et al.,
Intervening Plaintiffs-Appellants,

United States of America, Intervening
Plaintiff-Appellee,

v.

Ray BLANTON, Governor of the State
of Tennessee, et al.,
Defendants-Appellees,

University of Tennessee, et al.,
Defendants-Appellees,

Tennessee Higher Education Commission,
Defendant-Appellee,

State Board of Regents,
Defendant-Appellee.

Nos. 77–1622, 77–1624.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 18, 1978.

Decided April 13, 1979.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, New York City, for intervening plaintiffs-appellants.

Thomas W. Steele, Gullett, Steele, Sanford & Robinson, Nashville, Tenn., for University of Tennessee.

D. Bruce Shine, Ferguson and Shine, Kingsport, Tenn., Joseph O. Fuller, Fuller & Tunnell, Kingsport, Tenn., for State Board of Regents.

Brian K. Landsberg, Robert J. Reinstein, Dept. of Justice, Washington, D. C., for United States.

Alfred H. Knight, III, Willis & Knight, Nashville, Tenn., for Tennessee Higher Education Commission.

Brooks McLemore, Jr., Atty. Gen. of Tennessee, Nashville, Tenn., for Blanton.

Before LIVELY and ENGEL, Circuit Judges, and PECK, Senior Circuit Judge.

LIVELY, Circuit Judge.

These consolidated appeals are from a judgment and order in litigation seeking desegregation of public higher education in Tennessee. The background and a description of the litigation may be found in this court's opinion in *Geier v. University of Tennessee,* 597 F.2d 1056, (1979). The plaintiffs-appellants Richardson et al. appeal from that portion of the district court's final judgment which approved the "long range plan" of the defendants insofar as it deals with desegregation of public institutions of higher education in Tennessee outside the metropolitan Nashville area. The same parties appeal from an order entered by the district court on July 22, 1977 in which the court denied motions to conduct hearings on objections to a plan for merger of two Nashville institutions, Tennessee State University (TSU) and the Nashville branch of the University of Tennessee (UT–N).

1. Over the years priorities have been established by Congress which require the advancement of certain categories of appeals. There

I

The order of July 22, 1977 is affirmed. As we pointed out in *Geier v. University of Tennessee, supra,* the district court held that the Nashville merger plan did not violate its judgment ordering the formulation of a plan. This conclusion has not been shown to be erroneous. Though the appeals in this case and in *Geier v. University of Tennessee* were expedited, because of the congestion of our docket and the necessity to grant priority to many other appeals,[1] nearly two years have passed since the judgment was entered in this case. During that time the formulation and implementation of the plan of merger for TSU and UT–N have gone forward. Any objections to the merger plan may be presented to the district court following issuance of the mandates in this case and in *Geier v. University of Tennessee.*

■ Further, we do not consider the issue which the appellants have attempted to raise with respect to an alleged effort to oust the president of TSU. This matter was raised by an affidavit of a non-party filed after entry of the judgment and notices of appeal and is not part of the record before us. The district court retained jurisdiction for the purpose of enforcing its previous orders in this case, and any claims that the defendants are failing to carry out those orders in good faith should be presented to the district court in the first instance.

II

In *Geier v. University of Tennessee* we held that the district court did not exceed its equitable power or abuse its discretion in ordering the merger of TSU and UT–N. In this appeal we are primarily concerned with the validity of the provisions for statewide desegregation contained in the long range plan. The appellants contend that the district court committed reversible error in failing to evaluate the specific goals and policies of the statewide features of the

are presently more than twenty priority categories.

long range plan. They also argue that the plan dooms statewide desegregation by leaving its implementation in the hands of the defendants. In a supplemental brief and at oral argument the appellants urged the court to bring the U.S. Department of Health, Education and Welfare (HEW) into this case. It is not specified exactly to what extent HEW would be involved, except that its revised guidelines are urged upon us as creating minimum criteria for desegregation of public higher education.

## A.

The district court found that the long range plan, as it applied statewide outside Nashville, "appears to be a promising step forward and, under the careful supervision of the Monitoring Committee, should result in further progress." *Geier v. Blanton*, 427 F.Supp. 644, 661 (M.D.Tenn.1977). The appellants argue that it is not necessary that we hold this finding clearly erroneous in order to reverse the judgment of the district court. They contend that if the district court had subjected the long range plan to a more "refined analysis" it would have concluded that much of the progress in desegregation claimed by the defendants was illusory and that the constitutional duty to dismantle the dual system of public higher education in Tennessee would not be achieved in a reasonable time under the long range plan. More specifically the appellants contend that "revised criteria" published by HEW should be applied in Tennessee. Though the revised criteria were not issued until a year after the judgment was entered in this case, they were published in the Federal Register (43 Fed.Reg. 6658) on February 15, 1978 and we take judicial notice of their contents.

## B.

The long range plan, filed in July 1974, was prepared by a committee of representatives from the Board of Trustees of the University of Tennessee (UT Board), the Board of Regents, State University and Community College System of Tennessee (SBR) and the Tennessee Higher Education Commission (THEC). The committee was assisted by a bi-racial consultant panel of experts in education administration. It is stated in the introduction to the plan that the statewide goals "are statements of what ought to happen to bring about a fully desegregated system of public higher education in a situation where students will remain free to choose the institution they will attend, or even if they will choose to go to college at all." The introduction emphasizes that the goals are more than mere projections of past trends; the additional element is "evaluations of the impact of various actions which defendants can take to affect enrollment, and faculty employment to see if they are achievable . . ."

The plan sets out separate goals of black student enrollment to be attained by 1975 and 1980 for the community colleges, the universities under control of SBR and the University of Tennessee. The goals for the SBR universities are stated both with TSU included and excluded. These goals were summarized in a chart which also showed actual black enrollments for 1969 and 1973. The chart is reproduced here:

ACTUAL AND PROJECTED DEGREE CREDIT HEADCOUNT ENROLLMENT
OF BLACK STUDENTS IN TENNESSEE'S PUBLIC COLLEGES
AND UNIVERSITIES FOR SELECTED YEARS, 1969–80

| | ACTUAL | | | | PROJECTED | | | |
| | 1969 | | 1973 | | 1975 | | 1980 | |
| | Black Enrollment | % of Total | Black Enrollment | % of Total | Black Enrollment | % of Total | Black Enrollment | % of Total |
|---|---|---|---|---|---|---|---|---|
| Community Colleges | 398 | 7.44 | 2,387 | 16.0 | 3,515 | 19.1 | 5,744 | 23.2 |
| Regents Universities | | | | | | | | |
| Excluding TSU | 2,354 | 5.44 | 3,446 | 6.8 | 4,286 | 8.0 | 5,534 | 9.6 |
| Including TSU | 6,853 | 14.34 | 7,581 | 13.8 | 8,597 | 14.8 | 9,614 | 15.4 |

ACTUAL AND PROJECTED DEGREE CREDIT HEADCOUNT ENROLLMENT
OF BLACK STUDENTS IN TENNESSEE'S PUBLIC COLLEGES
AND UNIVERSITIES FOR SELECTED YEARS, 1969–80—Cont'd

| | ACTUAL | | | | PROJECTED | | | |
| | 1969 | | 1973 | | 1975 | | 1980 | |
| | Black Enrollment | % of Total | Black Enrollment | % of Total | Black Enrollment | % of Total | Black Enrollment | % of Total |
|---|---|---|---|---|---|---|---|---|
| Total Regents System | | | | | | | | |
| Excluding TSU | 2,752 | 6.03 | 5,833 | 8.08 | 7,801 | 10.9 | 11,278 | 13.7 |
| Including TSU | 7,251 | 13.99 | 9,968 | 14.2 | 12,112 | 15.8 | 15,358 | 17.6 |
| University of Tenn. | 1,117 | 3.2 | 2,200 | 5.1 | 3,151 | 6.7 | 4,975 | 9.2 |
| Total Excluding TSU | 3,869 | 4.62 | 8,033 | 7.1 | 10,952 | 9.2 | 16,253 | 11.9 |
| Grand Total | 8,368 | 9.47 | 12,168 | 10.74 | 15,263 | 12.4 | 20,333 | 14.4 |

If the goals are achieved the gap between black student enrollment and the black population of college age will be reduced from 5 per cent in 1973 to between 1.2 and 2.7 per cent in 1980. In the community colleges and the regents system, including TSU, the percentage of black students will exceed the proportion of the population who are black and of college age.

In preparing the plan the committee did not set a single goal, applicable to all institutions. The committee recognized that many of the institutions draw large numbers of students from nearby counties and that the black population of Tennessee is not evenly distributed throughout the State. The distribution of the black population of Tennessee was considered along with the "drawing area" of each school. It was felt that statewide desegregation would be achieved if each institution enrolled black students in approximate proportion to the black population of its service area.

The long range plan set statewide goals for black faculty and staff of 5 per cent by 1975 and 8.2 per cent by 1980. The committee noted that a recent survey of the American Council on Education had determined that only 3 per cent of the faculty and staff of American institutions of higher education were black. Again, different goals were assigned to the various institutions rather than a single goal applicable to all. These goals are summarized in the following chart, which was included in the plan:

| | Actual | | | | | | Projected | | | | | |
| | Fall 1969 | | | Fall 1973 | | | Fall 1975 | | | Fall 1980 | | |
| | Total | Black | % Black | Total | Black | % Black | Total | Black | % Black | Total | Black | % Black |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comm. Col. | 236 | 4.5 | 1.9 | 609.2 | 32.4 | 5.3 | 665.7 | 48.9 | 7.3 | 909.7 | 89.6 | 9.8 |
| Reg. Univ. | | | | | | | | | | | | |
| W/TSU | 2,220 | 253.3 | 11.4 | 2,671.8 | 231.7 | 8.7 | 2,939.1 | 274.7 | 9.3 | 3,152.4 | 328.3 | 10.4 |
| W/out TSU | 1,936 | 13.3 | 0.7 | 2,363.2 | 33.5 | 1.4 | 2,640.2 | 61.9 | 2.3 | 2,838.7 | 149.0 | 5.3 |
| UT | 2,033 | 20.5 | 1.0 | 2,598.0 | 51.1 | 2.0 | 2,724.0 | 92.0 | 3.4 | 2,975.0 | 164.0 | 5.5 |
| Total | | | | | | | | | | | | |
| W/TSU | 4,489 | 278.3 | 6.2 | 5,879.0 | 315.2 | 5.7 | 6,328.8 | 415.6 | 6.6 | 7,037.1 | 581.9 | 8.2 |
| W/out TSU | 4,205 | 38.3 | 0.9 | 5,570.4 | 117.0 | 2.1 | 6,029.9 | 202.8 | 3.4 | 6,723.4 | 402.6 | 6.0 |

In addition to setting goals for the desegregation of student bodies, faculty and staff of the public institutions of higher learning, the long range plan establishes a monitoring system. A continuing desegregation committee (the monitoring committee) is charged with the following responsibilities:

(1) to conduct an annual review of desegregation progress statewide and at each institution and report the results to the district court by November 15th of each year;

(2) to make recommendations to the UT Board, SBR and THEC of needed addi-

tions or changes in the desegregation plan; and

(3) to make further studies or collect additional information necessary to monitor the progress in achieving the desegregation goals specified in the plan.

The composition of the monitoring committee is bi-racial and consists of the chief executive and three members each of the UT Board, SBR and THEC.

### C.

The appellants dispute the district court's finding that "the steady increase in black enrollment at the predominantly white institutions has continued." 427 F.Supp. at 650. The court made this finding on the basis of the first desegregation progress report which the monitoring committee filed in February 1976. It is the position of the appellants that the overall increase in the number of black students has not resulted in a significant decrease in the effects of the dual system. This is so, they say, because a disproportionate number of the black students are concentrated in a few institutions while white students are almost equally divided among community colleges, SBR universities and the various campuses of the University of Tennessee. Further, it is clear that the traditionally white graduate schools—particularly schools of law and medicine—remain overwhelmingly white.

With regard to desegregation of faculties the appellants again dispute the finding of the district court that there was "a small, but steady, increase" in the progression of black faculty between 1969 and 1975. 427 F.Supp. at 651. The appellants maintain that most of the traditionally white universities have few black faculty members and that the increases have taken place largely at a few institutions, most notably Shelby State Community College, a Memphis institution with a large black student body. It is also pointed out that several of the traditionally white universities have hired former TSU black faculty members, resulting in no net gain in the number of black faculty statewide. The appellants also con-

tend that virtually no progress has been made in desegregating the administrative staffs of the various institutions and the non-institutional administrative personnel of the two governing boards and THEC.

In addition to disputing the finding of past progress the appellants sharply criticize the plans for future desegregation. The approach is labeled "non-comprehensive and non-systematised" and the goals are said to be "too low and too distant." One complaint is that there is no centralized body with enforcement powers and that the monitoring committee has no real power, no staff and a minimal budget. The appellants also argue that the plan is deficient for lack of a commitment to scholarship funds for black students and for lack of a requirement that the institutions report to the court on their retention of black students.

The appellants say that the district court would have discovered these defects if it had undertaken to evaluate the specific goals and policies rather than making a generalized finding that the long range plan is adequate. It is their position that the district court did not carefully consider all the evidence before it and that it abdicated its responsibility to supervise desegregation by delegating this function to the monitoring committee.

### D.

The United States did not appeal. It notes in its brief as an appellee that the percentages of black student enrollment at all state institutions more than doubled between 1969 and 1975 and urges affirmance of the judgment insofar as it holds that desegregation of students is progressing at a constitutionally acceptable rate. The United States also concludes that the student goals for each institution under the long range plan are based on valid formulas and are acceptable, and agrees with the finding of the district court that the monitoring committee can supervise implementation of the plan adequately by exercising careful supervision.

The United States questions the judgment in one respect only. It urges us to vacate that portion of the judgment finding the long range goals for faculty desegregation to be adequate. It argues that the district court failed to make findings on undisputed evidence that a disparity exists between salaries paid to black and white faculty members at all traditionally white institutions. Since the defendants contend that Tennessee was in a difficult competitive situation in attempting to attract qualified black faculty members, it is argued that lower salaries paid to black teachers may account for this difficulty in hiring. The United States also concludes that the district court did not consider the fact that a disproportionate number of black faculty are employed at community colleges and that much of the improvement in desegregation of faculties at traditionally white universities has resulted from the movement of teachers from TSU to other institutions.

E.

The State appellees seek to support the district court's judgment in several ways. They point out that the long range plan directs employment of a number of strategies to achieve desegregation in addition to setting numerical goals. One result of this requirement is that an affirmative action policy was adopted by SBR and each of its institutions was directed to do the same. The progress report contains evidence of genuine efforts by all institutions to achieve the goal of statewide desegregation, they assert.

More specifically the appellees rely on the fact, as shown in the progress report, that the percentage of black freshmen enrolled at all institutions in the fall of 1975 exceeded the percentage of black persons in the Tennessee population. It is also argued that steady progress has continued in the effort to increase the number and proportion of black faculty members throughout the public higher education system. The claim of appellants and the United States that there was undisputed evidence of salary disparities which the district court failed to consider is challenged. The witness who testified to this effect admitted on cross-examination that in making his analysis of comparative salaries he did not consider time in academic rank, performance grading, publication and research activities and the places from which advance degrees were obtained. The appellees take the position that the district court was permitted to weigh this testimony as any other, and was not required to accept the conclusions of the witness.

III

The district court's approach to the statewide aspects of the long range plan must be viewed in proper perspective. From the beginning of this litigation the district court looked upon the situation in Nashville involving TSU and UT–N as "the heart" of the problem of segregated public higher education in Tennessee. The court and the original plaintiffs proceeded on the premise that the essential first step in achieving a unitary system must occur in Nashville. *Sanders v. Ellington*, 288 F.Supp. 937, 942–43 (M.D.Tenn.1968). There had been virtually no progress by 1968 in desegregating TSU, and the expansion of UT–N ultimately was found to be a deterrent to any hope of attracting a white presence to TSU. *Geier v. Blanton, supra*, 427 F.Supp. at 652–53. At the same time that TSU remained overwhelmingly black many of the traditionally white institutions were making some progress in desegregating their faculties and student bodies. Thus, while the rest of the system was not ignored, the focus of the court was clearly on Nashville. Nevertheless, when a situation outside Nashville which threatened the progress of desegregation was brought to the court's attention, it acted with dispatch. On June 20, 1973 the district court, in the present case on the motion of appellants herein, enjoined construction of a community college campus in a predominantly white section of Shelby County and directed that a mid-town Memphis campus be developed first. The court found that the prospects

were good for a reasonable racial balance in the student body at the mid-town site whereas a school at the old county penal farm would be overwhelmingly white.

The approach of the district court to this complicated case was to require steady progress statewide while concentrating on the areas where local conditions or actions presented identifiable obstacles to the required dismantling of Tennessee's dual system of public higher education. This was a reasonable procedure.

In determining that the long range plan was constitutionally adequate Judge Gray had before him the desegregation progress report filed February 15, 1976 and the minutes of the monitoring committee as well as the testimony and documentary evidence received at the trial. The progress report disclosed continued progress toward a more balanced distribution of black students. Approximately 60 per cent of the increase in black students from 1974 to 1975 was recorded at institutions other than TSU and Shelby State Community College which had the largest concentrations of black students. The progress report and monitoring committee minutes showed that the long range plan was not static. The goals ultimately adopted for black enrollment in the fall of 1975 exceeded those of the original plan as the result of adoption of "revised equal access goals."

Less success was reported in efforts to desegregate faculties and staff. The progress report noted a better distribution of black faculty from 1974 to 1975, but concluded that it is difficult to formulate realistic goals for black faculty and staff because of the intense national competition for a relatively small number of qualified black candidates. In this area "action steps" were adopted which included a program to aid faculty members lacking terminal degrees to complete their studies.

The progress report recognized that the increased numbers of black freshmen would require greater attention to problems of retention if the purposes of the plan were to be achieved. The report acknowledged that the best results were being achieved at the undergraduate level, but noted some progress in desegregating graduate schools other than law schools. The institutions under the SBR made the most consistent progress, achieving the interim goals for that system in all areas—student, faculty, institutional and non-institutional staff. Some progress in all areas was noted in the University of Tennessee system and the report pointed out that the desegregation goals for the UT system had been revised upward. The report concluded with a statement of the requirement that a "desegregation impact assessment" be made before changes could be made by a governing board in the following areas: (a) academic programs; (b) policies or requirements related to admissions, retention or graduation; (c) student financial assistance programs; (d) decisions involving the construction, closing or combining campuses and establishment of new institutions and cooperative programs.

IV

In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 417–18, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977), the Supreme Court set forth the role of a court of appeals in reviewing the judgment of a district court in a desegregation case as follows:

On appeal, the task of a court of appeals is defined with relative clarity; it is confined by law and precedent, just as are those of the district courts and of this Court. If it concludes that the findings of the district court are clearly erroneous, it may set them aside under Fed.Rule Civ.Proc. 52(a). If it decides that the district court has misapprehended the law, it may accept that court's findings of fact but reverse its judgment because of legal errors.

It is apparent from our study of the record that the findings of fact related to the statewide progress toward desegregation of public higher education in Tennessee are not clearly erroneous. The appellants assert error in the alleged failure of the district court to consider all the evidence be-

fore it. The mere fact that particular evidence is not mentioned in an opinion does not mean that it was not considered.[2] It was the duty of the District Judge as trier of the facts to weigh the evidence. We have no authority to direct that certain evidence be accepted and other evidence rejected, and no basis for assuming that competent evidence was not considered.

### A.

■ The appellants charge that the constitutional command to dismantle the dual system immediately will not be satisfied by adherence to the long range plan. Cf. *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The district court fully recognized the duty to require "a plan that . . . promises realistically to work now." *Id.* at 439, 88 S.Ct. at 1694. In its 1972 opinion, *Geier v. Dunn*, 337 F.Supp. 573, the court discussed the fundamental differences in public higher education and public elementary and secondary education which require different approaches to dismantling dual systems:

> Thus, regarding the disestablishment of a dual system of higher education, a court cannot—at least in the usual situation— order the transfer of faculty from one institution to another, order the transfer of students from one institution to another, or actually set the curricula at various such institutions. Over and above the question of such a court's actual *power* to do so, such relief would not be administratively feasible, because there would be no way to ensure that it actually worked: no court can "order" a student to confine himself to one college or university instead of another, for, unlike the situation in a system of elementary or secondary education, such persons are free to leave and go elsewhere as they wish. The lesson is that, when it comes to the disestablishment of a dual system of higher education, a federal court *cannot* do what it

might do in the realm of lower and secondary education: what works in one system will not work in another. Yet this is so as a practical matter, and not as a result either of there being less of a duty owed by a state to dismantle a dual system of higher education or of a lack of power—at least in a jurisdictional sense— on the part of a federal court to remedy such a situation. The limiting factor, from the court's point of view, is "What will work?"

337 F.Supp. at 579. (footnotes omitted).

We believe that the quoted language demonstrates a faithful adherence by the district court to the constitutional requirements. A careful weighing of many factors led the court to conclude that the long range plan offered the most realistic promise for desegregation of public higher education within a reasonable time. Instant desegregation is not achievable and has not been required. As we point out in our discussion of the HEW revised criteria, *infra*, "sequential implementation" over a period not to exceed five years is an accepted practice.

Though the district court approved the principle of phased steps toward statewide desegregation, it did not hesitate to require immediate action where local conditions required it. Thus, once the court concluded that the actions of UT–N were hindering the dismantling of segregation in the Nashville area, it applied the "radical" remedy of a court-ordered merger. When the proposed location for the campus of a community college in Shelby County threatened to increase rather than decrease segregation the court enjoined construction at that site. The district court demonstrated its determination to implement the constitutional demand for "whatever steps are necessary" (*Green*) to achieve desegregation by taking prompt and decisive action in these instances.

---

2. See Advisory Committee's Note of 1946 to Rule 52(a):

> But the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for

over-elaboration of detail or particularization of facts.

Quoted in 5A J. Moore, Federal Practice ¶ 52.-01(5), at 2607 (2d ed. 1977).

We find no error in the district court's conclusion that desegregation was progressing at a steady and acceptable rate outside Nashville and that the long range plan gave promise of continued progress. The court retained jurisdiction to implement its judgment and orders. If this progress should halt or seriously falter the court will be in position to impose new requirements.

## B.

■ The appellants also contend that the district court committed legal error in "abdicating" its duty to supervise desegregation by placing this responsibility on the monitoring committee. In *E. E. O. C. v. Detroit Edison Co.*, 515 F.2d 301, 317 (6th Cir. 1975), *vacated on other grounds*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977), we held that a district court could not delegate to a citizen committee its duty to resolve disputes arising under its decree. The functions of the monitoring committee established by the long range plan are to review and report on progress, to make recommendations for changes and to make such other studies as may be necessary to monitor the program of desegregation. The district court clearly expected valuable assistance from it but there was no delegation of any judicial responsibilities to this committee. The district court retained its full authority to control the program of desegregation, looking to the monitoring committee for reports and recommendations. This was not an abdication of the court's duty.

## C.

■ The appellants further argue that it was error to approve a plan which dealt with the various institutions individually rather than taking a statewide approach as prescribed in *Adams v. Richardson*, 156 U.S. App.D.C. 267, 480 F.2d 1159 (D.C.Cir. 1973). *Adams* was an action brought pursuant to Title VI of the Civil Rights Act of 1964 to compel the Secretary of HEW to require desegregation of public higher education in a number of southern states. The decision in *Adams* does not enunciate the rule that a plan which approaches a statewide problem of desegregation fails to satisfy constitutional standards by treating the several institutions individually. The constitutional requirement is to dismantle the dual system as quickly as possible, using methods which may be realistically expected to work. No institution was excluded from the Tennessee long range plan and it is statewide in scope. There is no merit to this argument.

## V

After briefing of this appeal was completed the appellants filed a motion for leave to file a supplemental brief. The proposed brief and several exhibits were filed with the motion. This motion was passed to the merits of the appeal and is now granted. The single proposition argued in the supplemental brief is, "The HEW Revised Criteria and Progress Report Indicate that the Lower Court Erred in Implementation of the Nashville Merger and Statewide Desegregation." The revised HEW criteria are those issued on February 15, 1978 and the progress report referred to is the annual report required by the long range plan dated February 16, 1978. The district court has not had an opportunity to consider this argument and we do not reach it. Though we take judicial notice of the revised HEW criteria, neither they nor the February 16, 1978 progress report are part of the record on appeal. Our examination of the revised HEW criteria discloses many similarities and many differences between them and the long range plan. The HEW criteria obviously deal with long-term objectives. The criteria require timetables for the *sequential implementation* of necessary actions in order to achieve stated goals "as soon as possible, but not later than within five years . . . ." 43 Fed.Reg. at 6661. The goals which are required are referred to as "benchmarks." A benchmark is a standard by which to measure future achievement. An acceptable plan is described as one which assures that students will be attracted to each institution on the basis of educational programs and opportu-

nities uninhibited by past practices of segregation. The long range plan appears to contain many of the elements of an acceptable plan under the HEW criteria. It is interesting to note that Judge Gray's statement of factors requiring special consideration in developing a plan for desegregation in higher education (*Geier v. Ellington*, 288 F.Supp. at 943) is quoted in the statement of "legal and educational principles" in the preamble to the criteria. 43 Fed.Reg. at 6659.

Upon issuance of the mandate from this court the parties will be free to seek a hearing in the district court on any motions related to developments since the judgment was entered in this case. Matters related to the February 16, 1978 progress report and the revised HEW criteria should be presented in this manner. It would lengthen this opinion unduly to discuss in detail each assignment of error. On the record before this court we hold that the findings of fact of the district court are supported by substantial evidence and no errors of law requiring reversal were committed. As has been emphasized repeatedly herein, the district court has retained jurisdiction to oversee implementation of the long range plan. If further refinements of the plan or new devices are required to reach the condition which the Constitution requires, nothing contained in this opinion will hinder the district court from taking all steps reasonably calculated to achieve that goal.

The judgment of the district court is affirmed. No costs are allowed.