692 F.Supp. 642 (1988)
UNITED STATES of America
v.
STATE OF LOUISIANA, et al.
Civ. A. No. 80-3300.
United States District Court, E.D. Louisiana.
August 2, 1988.
*643 Wm. Bradford Reynolds, Asst. Atty. Gen. for Civil Rights, Nathaniel Douglas, Franz R. Marshall, T.A., LeVern M. Younger, Zita Johnson-Betts, Educational Opportunities Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.
Mack E. Barham, T.A., Margaret E. Woodward, Lynette F. Judge, Barham & Churchill, New Orleans, La., for Bd. of Regents.
Robert A. Kutcher, T.A., Jan Marie Hayden, Julia Mandala, Bronfin, Heller, Steinberg & Berins, New Orleans, La., for Bd. of Trustees.
W. Shelby McKenzie, T.A., Nancy C. Tyler, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Bd. of Sup'rs of LSU.
Henry N. Brown Jr., Dist. Atty., Benton, La., for Bossier Parish School Bd.
William J. Guste Jr., Atty. Gen., Winston G. DeCuir, T.A., Chief, Civ. Div., Loretto M. Babst, Asst. Atty. Gen., Russell R. Hodges II, Staff Atty., John N. Kennedy, Sp. Counsel to the Governor, Baton Rouge, La., for State of La. and for Bd. of Elementary and Secondary Educ.
Thomas N. Todd, Chicago, Ill., for amicus curiae Grambling State Univ. Alumni Ass'n.
Before WISDOM, Circuit Judge, and SCHWARTZ and WICKER, District Judges.

ORDER AND REASONS
CHARLES SCHWARTZ, Jr., District Judge.
This matter is before the Court on cross-motions for summary judgment on the issue of liability. For the following reason, the Court now GRANTS IN PART AND DENIES IN PART plaintiff's motion, GRANTS motions of defendants Bossier Parish School Board and BESE, and DENIES all other defendants' motions.
This is a college discrimination suit. Alleging that Louisiana had been maintaining a dual system of public higher education on the basis of race in violation of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, the United States commenced this suit in March 1974 against the State of Louisiana and its various State boards that oversee the State's public institutions of higher learning. In *644 September 1981, the Court approved a consent judgment, 527 F.Supp. 509. In December 1987, the United States moved pursuant to certain terms in the decree for hearing to determine whether defendants have fully implemented all provisions of the decree and are operating a unitary system of public higher education. The Court has set the trial (both for this issue of liability and, if liability is found, for the issue of remedy) for September 1988.
Each side asserting that no trial is needed on the issue of liability, both sides now cross-move for summary judgment on this issue. All agree that the State operated a de jure segregated system of public higher education prior to the enactment of Title VI and has not implemented all provisions of the 1981 decree and that most all of the State's public institutions of higher learning remain racially identifiable; beyond this, however, the parties disagree. On the one hand, the United States, along with the predominantly black institutions, argues that unlawful vestiges of State's former de jure segregated system will remain unless the State spends the additional money contemplated under the decree. On the other hand, the State argues that the full implementation of the decree provisions would actually promote segregation and that the State has implemented sufficient good faith efforts at ending the dual system so as to warrant a dismissal of the entire case.
For the instant motions, the parties have submitted hundreds of pages of briefs and exhibits. Unfortunately, the parties have concentrated the vast bulk of their efforts on the issue of remedy and on an improper standard of liability. As explained below, the Court finds, except as to the Bossier Parish Community College and the St. Bernard Parish Community College, that Louisiana is continuing to operate an unlawful, dual system of public higher education in violation of Title VI.

I.

A.
The material facts for the issue of liability are not in dispute. Up to at least 1954, Louisiana had a system of higher education segregated by race under state law. Not until some time after the enactment of the Civil Rights Act of 1964 did Louisiana discontinue its official recognition of its institutions of higher education as being either for "whites" or for "blacks." The present admissions policies to all of Louisiana's public institutions of higher education no longer discriminate on the basis of race or otherwise; any Louisiana citizen who has graduated high school may attend the Louisiana public college of his choice, regardless of the person's academic qualifications. All parties agree that "[p]ublicly financed higher education in Louisiana is paid for primarily with state and federal funds" and that Louisiana's state-supported colleges and universities have and continue to receive federal funds.
Louisiana has twenty institutions[1] of higher education each of which is under the supervision of the Board of Regents and one of the three other higher education boards. The four institutions that were originally established as "black" schools (Southern University-Baton Rouge, Southern University-New Orleans, Southern University-Shreveport/Bossier City, and Grambling State University)[2] remain predominantly black. The eleven institutions that were originally established as "white" schools (LSU-Baton Rouge, LSU-Shreveport, *645 UNO, LSU Law School, Louisiana Tech University, McNeese State University, Nicholls State University, Northeast Louisiana University, Northwestern State University, Southeastern Louisiana State, and the University of Southwestern Louisiana)[3] remain predominantly, and disproportionately, white. Four of the other schools (LSU-Alexandria, LSU-Eunice, LSU Medical Center, and LSU Agricultural Center), whose full histories have not been provided to this Court, are all predominantly, and disproportionately, white. Only one institution, Delgado Community College, appears not to have a student body of predominantly one race.[4] The enrollment statistics by race for 1981, when the consent decree was implemented, and 1987, the last year of the consent decree, are as follows:[5]

 1981 1987
 BLACK WHITE TOTAL BLACK WHITE TOTAL
 # % # % # % # %
 DELGADO 3,371 40.1% 4,348 51.7% 8,404 2,270 32.0% 4,133 58.3% 7,094
 GRAMBLING 3,777 98.5% 44 1.1% 3,834 5,435 96.7% 180 3.2% 5,623
 LA TECH 1,194 11.6% 8,489 82.5% 10,288 1,132 11.4% 7,492 75.1% 9,970
 McNEESE 1,062 15.3% 5,706 82.2% 6,943 970 13.2% 6,255 85.0% 7,359
 NICHOLLS 1,068 15.0% 5,954 83.6% 7,119 857 12.1% 6,060 85.9% 7,057
 NORTHEAST 2,431 22.0% 8,544 77.2% 11,071 1,543 15.6% 8,165 82.7% 9,877
 NORTHWESTERN 1,296 19.4% 4,448 66.6% 6,682 1,263 20.7% 4,494 73.8% 6,090
 SOUTHEASTERN 1,112 12.6% 7,633 86.2% 8,854 518 6.4% 7,423 91.8% 8,089
 SOUTHWESTERN 2,380 17.4% 10,931 79.8% 13,702 2,523 17.8% 11,195 79.0% 14,172
 LSU A 151 9.9% 1,357 88.8% 1,528 202 10.0% 1,762 88.2% 2,020
 LSU BR 1,688 6.3% 22,832 84.7% 26,964 2,027 7.9% 22,714 88.0% 25,821
 LSU E 237 15.5% 1,283 84.0% 1,528 198 11.5% 1,510 87.8% 1,720
 LSU LAW 16 1.9% 830 96.1% 864 6 0.8% 689 96.0% 718
 LSU S 315 7.6% 3,803 91.5% 4,155 359 8.2% 3,871 88.9% 4,353
 UND 2,491 16.1% 11,519 74.6% 15,432 2,448 15.5% 12,121 76.5% 15,836
 SU BR 7,655 86.4% 228 2.6% 8,855 8,654 92.7% 438 4.7% 9,338
 SU NO 1,994 82.4% 11 0.5% 2,420 3,185 87.1% 400 10.9% 3,657
 SU S 661 99.8% 1 0.2% 662 308 94.5% 41 4.8% 855
 TOTAL 32,899 23.6% 97,961 70.3% 139,305 34,398 24.6% 98,963 70.9% 139,649

Despite the slight increase in black enrollment statewide, the racial polarization has increased as a whole during the term of the consent decree: the predominantly white institutions had about 2000 fewer black students in 1987 than in 1981, while the predominantly black institutions showed only a negligible increase in white enrollment from around 0.3% in 1981 to around 1.1% in 1987. In 1981, around 55% of the black students enrolled at institutions of public higher education in the state were enrolled at predominantly white institutions, while in 1987 the corresponding figure fell significantly to about 47%.
Further, a close look at the documents submitted to the Court pursuant to the consent decree suggest that even these abysmal statistics may inaccurately suggest a better racial balance than is reality. Under the consent decree, an exchange student who takes only nine credit hours at another school may be counted as being a full-time student enrolled at that other school,[6] even though the regular state requirement for full-time credit is at least twelve hours of school work. Further, under the decree, an exchange program between UNO and SUNO, among other exchange programs between other proximate state schools, was established. As the program was implemented, certain courses required for graduation at UNO could only *646 be taken at SUNO,[7] although there was not a reciprocal requirement for SUNO students.[8] The effect, then, was to have UNO (white) students being forced to take occasional classes at SUNO and being counted towards SUNO's voluntary student enrollment, thereby giving a deceptive appearance that the white student enrollment at SUNO was higher than in actuality.
The four board governing these twenty schools suffer from similar racial identifiability. The Southern Board remains over three-fourths black, while the other three boards are between 70% and 80% white.
In sum, as the Board of Regents states in the first paragraph of its memorandum in support of its motion, "[t]hat the racial identifiability of Louisiana's public colleges and universities persists today is ... undisputed."

B.
On January 13, 1969, October 21, 1969, May 21, 1973, and November 10, 1973, authorized representatives of the United States Department of Health, Education, and Welfare (HEW) sent the appropriate agents of the State of Louisiana letters charging that Louisiana was operating "a racially dual system of public higher education" in violation of Title VI. The letters requested the State to submit a statewide desegregation plan; believing it was not in violation, the State submitted none.
On January 11, 1974, pursuant to a court order in Adams v. Richardson,[9] HEW's General Counsel wrote to the Assistant Attorney General for Civil Rights of the United States Department of Justice and recommended that appropriate judicial proceedings be brought. Accordingly, on March 14, 1974, the Attorney General commenced this action on behalf of the United States in the Middle District of Louisiana pursuant to sections 601 and 602 of the Civil Rights Act of 1964, as amended,[10] and the Fourteenth Amendment. Plaintiff having properly requested a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284, a three-judge court was convened.
Named as original defendants were the State of Louisiana, the Louisiana State Board of Education, the Louisiana Coordinating Council for Higher Education of the State of Louisiana, the Louisiana State Board of Supervisors, and the Louisiana Board of Regents plus the members of each of these four boards. In March 1976, following the restructuring of Louisiana's higher education boards by the Louisiana Constitution of 1974,[11] the parties jointly moved to substitute the following five defendants in place of the original named defendants: the State of Louisiana, the Board of Regents, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, the Board of Supervisors of Southern University and Agricultural and Mechanical College, and the Board of Trustees of State Colleges and Universities.
At the consent of all parties, the Court transferred the matter on August 15, 1980 to the Eastern District of Louisiana pursuant *647 to 28 U.S.C. § 1404(a). Trial was later set for September 1981.
In November 1980, plaintiff further amended its complaint to add the State Board of Elementary and Secondary Education (BESE), the St. Bernard Parish School Board, the Bossier Parish Board, the State Superintendent of Public Education, the Superintendent of Schools for St. Bernard Parish and the Superintendent of Schools for Bossier Parishall for their supervisory roles over the Bossier Parish Community College and the St. Bernard Parish Community College.[12]
Just prior to the trial, the parties entered into a consent decree, which the Court approved on September 8, 1981.[13] By its terms, the consent decree was to expire automatically on December 31, 1987, unless plaintiff timely filed a motion to determine whether defendants had fully implemented the decree and were operating the State's system of public higher education on a unitary basis.
On December 29, 1987, plaintiff so moved. The Court then set the hearing date for September 22, 1988. Plaintiff has now moved for partial summary judgment on the issue of liability. The Board of Regents and the Bossier Parish School Board have in turn cross-moved for summary judgment on the issue of liability as well. The LSU Board and the Board of Trustee have filed memoranda adopting the Board of Regents' arguments in its motion and in its opposition to plaintiff's motion; the State and BESE have filed a memorandum adopting both the Bossier Parish School Board's motion and the Board of Regents' motion and opposition. The Court deems the LSU Board, the Board of Trustees, the State, and BESE each to be moving for summary judgment as well. The Grambling State University Alumni Association, amicus curiae, urges the Court to grant plaintiff's motion. The Southern Board and the St. Bernard Parish School Board have submitted no motions or memoranda, nor have any of the individual defendants.

II.

A.
At the status conferences held before the Court earlier this year, all counsel appeared to concede, though occasionally for incorrect reasons, that this Court still retained jurisdiction over this matter, despite the passing of the December 31, 1987 termination date in the consent decree. The Board of Trustees now appears to disagree and argues that this matter has become res judicata. Because the Board of Trustees misconstrues the terms of the consent decree as to finality and because the issue is jurisdictional, this Court first addresses its present jurisdiction.[14] As explained below, the matter is presently in the same posture it would have been, had no consent decree ever been filed.
In entering into the consent decree, defendants denied all allegations that they were not in full compliance with Title VI and the Fourteenth Amendment.[15] Part III(C) of the decree provides, in part, that "[n]o party waives the right to raise any previously contested issues or any issues addressed in this Decree or in this lawsuit should litigation ensue at the expiration of this Decree or at any prior time thereto." Part IV of the decree, on "Jurisdiction," reads in whole as follows:

*648 This Court shall retain jurisdiction of this action to assure the implementation of the provisions of this Decree; to monitor the effect of the actions taken pursuant to this Decree; to insure that the Louisiana system of higher education is operated on a unitary basis in all respects; and to consider any motions to modify provisions of this Decree or other appropriate pleadings in this case, subject to the provisions of Part V.
Part V, on "Term of Decree," reads in whole as follows:
A. This Decree shall become effective immediately upon the date of its entry by the Court and shall remain in effect until at least December 31, 1987. The Court shall retain jurisdiction over the case until December 31, 1987.
B. If any party, prior to December 31, 1987, has commenced proceedings either to seek compliance with this Decree or to seek other relief necessarily implicating this Decree, this Court shall retain jurisdiction over this action until all issues relating to such proceedings have been resolved.
C. On December 31, 1987, this Decree shall terminate automatically and without further formality unless the plaintiff by motion requests this Court to conduct a hearing for the purpose of determining whether the defendants have fully implemented all provisions of this Decree and are operating the system of public higher education on a unitary basis.
D. Should this Court determine, at the time of the hearing, that the State of Louisiana and all defendant higher education boards have effectively implemented all provisions of this Decree and are operating the system of public higher education on a unitary basis, the defendants shall be released from the jurisdiction of this Court and this Decree shall be terminated. In such hearing brought upon motion of plaintiff, the burden of proof shall be upon the plaintiff to prove that the defendants have not fully implemented the provisions of this Decree.
E. Should this Court determine at the time of the hearing that any provision of the Consent Decree has not been effectively implemented or that the defendants are not operating the system of public education in a manner consistent with the goals and objectives of this Decree, this Court shall enter such orders to provide additional or further relief as is appropriate and shall retain jurisdiction until such implementation has been accomplished.
As Part IV of the decree acknowledges, it is axiomatic that this Court retains jurisdiction over this matter at all times necessary to effectuate the provisions of the decree. While the second sentence of Part V(A) appears literally to suggest that in all events this Court loses jurisdiction over this matter on December 31, 1987, such a literal reading is plainly illogical in light of the remaining provisions of Part V. The "unless" clause in part V(C) contemplates that a hearing may be brought after December 31, 1987; such a hearing would be meaningless unless it were further understood that this Court retained jurisdiction to conduct the hearing. Further, Part V(E) acknowledges that this Court shall retain continuing jurisdiction after the hearing to effectuate any order entered arising from the hearing. Finally, Part III(C) specifically contemplates litigation at the expiration of the decree.
On December 29, 1987, two days before the decree was due to expire automatically, plaintiff filed a motion for a hearing in accordance with Part V(C) of the decree. The act, of its own force, extended this Court's jurisdiction until its resolution of question "whether the defendants have fully implemented all provisions of this Decree and are operating the system of public higher education on a unitary basis." If the Court determines the answer is yes, then in accordance with Part V(D), the decree would terminate and this Court's jurisdiction would end.[16] If the Court determines the answer is no, then in accordance *649 with Part V(E), the Court continues to retain jurisdiction.
A finding that defendants have not effectively implemented the decree or that Louisiana's public higher education system is not being operated on a unitary basis does not necessarily require the Court to compel compliance with the decree's provisions; instead, the Court is only "to provide additional or further relief as is appropriate." If the Court determines that compliance with the decree will effectively and best eliminate any dual system, then the appropriate relief will be such an order of compliance; if the Court determines otherwise, however, the appropriate relief may differ from the provisions of the decree. In other words, among the implicit provisions of the consent decree itself is the possibility that this Court may find that the decree has failed in its purpose and thus may craft a remedy as if no decree had ever been made.
With this background, it should be patent that the doctrine of res judicata has no place at this juncture in this matter. On the one hand, a system does not become unitary merely upon entry of a court order, including a consent decree, intended to transform it into a unitary system.[17] On the other hand, because of plaintiff's motion for a hearing, the consent decree has not yet expired (although because plaintiff waited so that the hearing would have to fall after the consent decree term, any available remedies necessarily precluded enforcement of the specific monetary obligations under the decree since these obligations ended in 1987 under the decree).[18] In sum, there has been no order or judgment that Louisiana's public higher education system has achieved a unitary basis.
In short, the Court now sits in the same procedural position it sat in 1981 before the decree was implemented, when the parties were preparing for trial on the merits. As explained below, the Court holds that plaintiff has proper standing to bring this action under Title VI, that Title VI's broadened reach is constitutional, that the twenty institutions under the four higher education boards are continuing to be operated under an unlawful, dual system of education in violation of Title VI, but that the two community colleges under BESE are not so continuing.

B.
Having received a referral from HEW, the Attorney General has authority to sue on behalf of the United States to enforce statutory requirements under Title VI.[19] Providing federal funds to defendants, the United States has standing to enforce the Title VI contractual assurances of nondiscrimination upon which its money allotments are made.[20] This much is undisputed.
Defendants dispute whether the United States has standing to assert claims directly under Fourteenth Amendment.[21] In seeking to enforce defendants' contractual assurances of compliance with Title VI, the *650 United States is simply seeking to enforce the Fourteen Amendment, for Title VI's standard is that of the Fourteenth Amendment.[22] In other words, whatever relief is available to a private plaintiff in a school desegregation suit under the Fourteenth Amendment is available to the United States under Title VI. With this understanding of the enforceability of the United States' contractual rights, the Court need not pass on defendants' dispute.[23]

C.
In March 1988, over the veto of the President,[24] Congress amended Title VI through its Civil Rights Restoration Act of 1987.[25] The purpose[26] of the amendment was to overrule Grove City College v. Bell,[27] which held that the reach of the similar Title IX of the Education Amendments of 1972[28] was solely a program-specific mandate and did not apply to an entire school system. The effect of the amendment, to quote defendants, "is to submit an entire university system to federal regulation under [Title VI] if any of its programs receive federal assistance."[29] It appears that this Court is the first to address the amendment or any other part of the new act in any context.
Defendants argue that Congress lacked the constitutional authority to broaden Title VI in the manner it did. They premise their argument on two points, with which this Court agrees: that Congress' constitutional power to enact Title VI comes under the constitution's spending power clause;[30] and that the holding of Grove City applies equally to Title VI.[31] Defendants then conclude two further points: Grove City interpreted Title IX, and by analogy Title VI, to its constitutional limit; therefore, or in the alternative, Congress exceeded its power in enacting the new act. Defendants misread Grove City and misconstrue Congress' spending power.
Defendants' first conclusion, that Grove City's holding was a constitutional one, is wholly without support. While it is well established that Congress cannot legislatively overrule a constitutional holding of a federal court, neither Grove City nor any *651 of the other pre-Title VI amendment cases purports to be a constitutional decision by holding that Title VI did not cover an entire school or school system when federal funds were going only to a narrow, specific program therein. These cases were all construing Title VI and its progeny's original text and Congress' objective, identifiable intent in enacting these laws.[32] Nor does the legislative history to Title VI's amendment suggest otherwise; the written objections of the President and certain Senators to the Amendment did not concern the overruling of Grove City to "prohibit discrimination ... across the board in ... public systems of higher education."[33] Indeed, defendants at one point concede that "the issue [in Grove City] was not framed in terms of the constitutionality of the statute."[34]
Thus, the Court must address defendants' alternative conclusion, that notwithstanding any judicial silence, the Grove City holding implicitly amounted to a constitutional holding. In other words, the Court must determine whether Congress exceeded its spending clause power by amending Title VI as it did.
The Supreme Court has recently articulated four limitations to Congress' spending power: first, the exercise of this power must be in pursuit of the "general welfare"; second, if Congress desires to condition receipt of federal funds, it "must do so unambiguously"; third, conditions on federal grants must be germane, or related, to the federal interest at issue; and finally, other constitutional provisions must not provide an independent bar to the conditional grant of federal funds.[35] Defendants concede that the first and last conditions are satisfied here.[36] Their dispute is solely over the application of the second and third conditions.
Concerning the second condition, the Court notes the Supreme Court's discussion on this point in Pennhurst State School and Hospital v. Halderman:[37]
[L]egislation enacted pursuant to Congress' spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.[38]
Defendants state that "[s]ystem-wide application of Title VI to a state's entire education system is an ambiguous condition because it is impossible for the state to *652 know what the condition will entail."[39] Defendants' statement is misplaced. While the statutory change effected by the amendment to Title VI may be onerous on both those who have discriminated and those beyond reproach,[40] the statutory change is, if anything, clear: now an entire school system is subject to Title VI's reach as long as the smallest part of the system receives any federal funds. The amendment does not, and does not attempt to, change the nature of a State's duty under Title VI; this duty remains as it always has been, the same duty as under the Fourteenth Amendment, the duty not to discriminate on the basis of race.[41] It is no defense that particulars of the remedy needed to cure a State's breach of Title VI (e.g., to cure a State's maintenance of a dual system of education in particular programs or in entire school systems)[42] may remain unknown to the breaching State before the remedy is voluntarily accepted by all parties involved or is ordered by a court; to accept defendants' position would imply that Congress may impose absolutely no conditions under Title VI inasmuch as the particulars on remedy always vary with the scope and nature of the breaches. As suggested in Part II(D) below, the goal of any remedy remains constant: the disestablishment of any discrimination.
Defendants further suggest that, contrary to the "contract" theory of Congress' spending power, the amendment would impose a retroactive condition on defendants. Defendants' cries of fairness are again misplaced. Any liability of defendants is for a present violation of Title VI, not for past violations.[43]
Finally, the Court can give little credence to defendants' position that "system-wide interpretation of Title VI also exceeds Congress' spending power because the condition is not germane to the federal interest in the particular grant programs."[44] As further explained in Part II(D) below, the condition imposed by Congress on defendants, that they may not discriminate on the basis of race in any part of the State's system of public higher education, is directly related to one of main purposes for which public education funds are expended:[45] equal education opportunities to all citizens.
In sum, this Court concludes that Congress has not exceeded its spending power in enacting Title VI as amended, insofar as the instant case is concerned.[46] It is not this Court's role to evaluate the wisdom in Congress' amendment; the Court's limited role in reviewing a Congressional statute is *653 only to determine if the statute is constitutional as applied to the case at issue. Having determined as much, the Court addresses below whether defendants have satisfied the conditions imposed under Title VI, that is, the conditions of complying with the Fourteenth Amendment.

D.
The basic principles at issue in this case have been well established by the Supreme Court. "Separate education facilities [on the basis of race] are inherently unequal"[47] in violation of the Fourteenth Amendment and must be corrected "with all deliberate speed."[48] Where a state has previously maintained a racially dual system of public education established by law, it has the burden, or affirmative duty, "to take the necessary steps `to eliminate from the public schools all vestiges of state-imposed segregation.'"[49] Further, "freedom-of-choice" policies (policies where students can freely choose what schools they attend) may at times be insufficient to satisfy this affirmative duty with timely adequacy.[50] The mere existence of a school with a student body of predominantly one race is, however, "not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of" the state.[51] In short, the "principles and ends can be collapsed into quality education without regard to race."[52]
While the Supreme Court's school desegregation opinions following Brown have all concerned primary and secondary education, lower courts have been unanimous in holding that this constitutional mandate to dismantle a racially dual structure applies in the higher education context as well.[53] As this Court has already recognized, however, many of the policies and problems concerning primary and secondary education differ widely from those concerning higher education; thus, many of *654 the means for effectuating the affirmative duty must differ between the two contexts.[54] Dispute lies primarily over the issue whether the scope of the duties and the remedies in the higher education context is as broad as has been defined and applied in the elementary and secondary education context.[55]
On the one hand, some courts have found states to have satisfied their duties in the higher education context by implementing good faith, racially neutral policies and practices where students are free to enroll where they wish, even where there continued to exist racially identifiable institutions within the state's public higher education system.[56] On the other hand, some courts have held that more is, at times, required.[57]
Both plaintiff and defendants argue that the Supreme Court's recent case of Bazemore v. Friday[58] adopts the former standard and rejects the latter for the higher education context.
In Bazemore, black employees and the United States sued the North Carolina Agricultural Extension Service (NCAES), a State agency; they alleged, among other things, that a pattern and practice of racial discrimination still existed in the NCAES-sponsored 4-H and Homemaker Clubs, which prior to 1965 had been segregated by law. The District Court had found that since 1965, the NCAES had adopted an open-door policy and that no person had been denied membership to any club on the grounds of race.[59] It further had found that a bulk of the 4-H and Homemaker Clubs remained all-white or all-black but that "any racial imbalance existing ... was the result of wholly voluntary and unfettered choice of private individuals."[60]
While the Court was unanimous on several points, a 5-4 majority held that "the mere continued existence of single race clubs does not make out a constitutional violation" where "one's choice of a club is entirely voluntary."[61] The majority distinguished Green:

Green v. School Board of New Kent County ... held that voluntary choice programs in the public schools were inadequate and that the schools must take affirmative action to integrate their student bodies. It was the effective predicate for imposing busing and pupil assignment programs to end dual school systems, but it has no application to the voluntary associations supported by the Extension Service. ... While school children must go to school, there is no compulsion to join 4-H or Homemaker Clubs, and while School Boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any Club he or she wishes to join. ... And however sound Green may have been in the context of public schools, it has no application to this wholly different milieu.[62]
In short, the majority found the distinction between voluntary, extracurricular clubs and (elementary and secondary) public schools to be legally significant. Both the majority and the dissent were silent on any effect of the Court's holding in the context of higher education.
Two lower courts have since addressed this 5-4 portion of Bazemore, both in the *655 context of higher education. The two courts came to opposite conclusions.
In Ayers v. Allain,[63] a federal district court in Mississippi held that Mississippi was no longer operating a dual system of public higher education. After trial on the merits, the court read Bazemore as drawing a critical distinction between elementary/secondary education and higher education.[64] The court explained:
In the college and university education context, however, where individuals have traditionally enjoyed free choice as to whether and when to attend school, the courts have considered it inappropriate to require state officials to maximize integration when assessing official action vis-a-vis the affirmative duty to disestablish a former de jure segregated system. The wisdom of this approach does not rest solely upon traditional notions, however. It also rests on the qualitative distinctions existing between the post-secondary and the elementary-secondary education systems. Elementary and secondary schools in a single district tend to be fungible in the sense that they generally strive towards uniformity in offerings, facilities and services. The opposite is true in higher education. A special emphasis is placed upon the relative uniqueness of the separate institutions comprising a public system of higher education. Indeed, the uniqueness of institutions[,] which results from the confluence of course offerings, services, size, location, faculty and students found at each institution, explains why freedom of choice is so valued and why the courts have not required the restriction of student choice in higher education.[65]
The test, the court found, was whether "current state higher education policies and practices ... are racially neutral, developed and implemented in good faith, and do not substantially contribute to the continued racial identifiability of individual institutions."[66] The court then applied its test to several categories (admissions policies, student recruitment and retention, assignment of institutional missions, allocation of funding, facilities, duplication of programs, faculty, and staff employment) to conclude that Mississippi was no longer running a dual system of higher education. Ayers is now on appeal before the Fifth Circuit.
In Geier II,[67] the Sixth Circuit affirmed the district court's approval of a consent decree using racial quotas for certain student recruitment in a university desegregation suit; the United States, as intervenor, was the sole party to oppose the consent decree. Rejecting the argument that Green does not control for higher education because such is voluntary, the court explained:
It appears fallacious to attempt to extend Bazemore to any level of education. While membership in 4-H and Homemaker Clubs offers a valuable experience to young people and families, particularly in rural areas, it cannot be compared to the value of an advanced education. The importance of education to the individual and the interest of the state in having its young people educated as completely as possible indicate clearly that the holding in Green rather than that of Bazemore applies.
It was established as the law of the case in the present litigation more than 15 years ago that Green applies to desegregation of public higher education. ... Nothing in the Bazemore decision, where the compelling interest of a state in the education of its citizenry was not involved, requires us to reexamine these holdings.[68]
It is unclear whether the Sixth Circuit specifically considered the distinction later noted in Ayers; it is clear, however, that the Sixth Circuit wholly rejects the approach in Ayers for all college contexts.
*656 While the rationale in Ayers is not without merit[69] and while the United States' position that Bazemore applies is entitled to some deference,[70] this Court cannot read Bazemore as directing that Green not apply to the instant case. As the Sixth Circuit noted in Geier II, club membership may be a valuable experience to many of our youth, but such cannot compare to the national need for educated citizens. The rationale in Green for finding that racially neutral admissions policies may at times be insufficient to satisfy the constitutional mandate to achieve unity systems of public education carries the same force in the higher education context as it does in the primary and secondary education context; all deliberate speed to achieve non-racially identifiable colleges is a must, just as it is for primary and secondary schools. When open admissions alone fail to disestablish a segregated school system, be it a primary/secondary school system or a college system, then something more is required.[71]
In the higher education context, of course, busing and mandatory attendance zones are not available solutions as they may be in the primary and secondary school context;[72] it does not follow, however, that nothing beyond open admissions is required to dismantle the dual system. Had the Supreme Court held in Green or elsewhere that the remedies beyond open admissions policies were limited to policies of mandatory student assignments to particular schools or programs, then this Court would be more inclined to follow the approach in Ayers. Such, however, is not the case. This distinction between primary/secondary education and higher education simply means that the appropriate remedy may well differ in the two contexts.
In vast, ever-growing segments of the American workforce, a high school diploma is not enough; a college education is often more critical than a high school education. The argument that the State requires students to attend primary and secondary schools[73] but cannot, or at least does not, require them to attend college fails to acknowledge the realities of our nation today. The purpose for a State's broad police power[74] to enact truancy and other regulatory school laws  its power to require children to attend primary and secondary school  is to promote an educated, self-supporting citizenry that can effectively and intelligently participate in our society.[75] While the State may not legally require its citizens to pursue a higher education, the fundamental interests that support a State's police power in the primary and secondary school context nonetheless still exist with all their force and reasoning for the higher education context; these underlying interests *657 of American society are what compel persons to seek higher education on their own volition. If blacks and other minorities are to compete in the market place for the more attractive and higher paying jobs in business and industry and to avail themselves of the benefits of corporate affirmative action programs, they need a college degree. In short, the ante for entrance into the top careers today is a college degree rather than a high school diploma.
In failing to achieve a truly unitary system at the higher level of public education, the State continues to provide polarization and separation on a racial basis. If we are working to breaking down barriers to race at all levels, we cannot overlook the socio-economic value of having integration at the college level. The interaction of the better minds, the exchange of various thoughts and aspirations, and the contacts made at college are factors to be considered, for these benefits carry over to the business world. In other words, there is something to the "old boy network." Separate colleges for blacks and whites obviously promotes a continuation of separate societies after graduation.
Defendants would have the law be that so long as there is freedom of choice in a State's public higher education system, a racially identifiable dual system is constitutional because a college student is mobile and can go to any State college he wishes. This position could, of course, only be considered if the State gave each school the same facilities and financial support so that the student would have a wholly free choice in deciding whether to attend one of the predominantly black schools or one of the predominantly white schools.[76] This, however, would come treacherously close to a mandate of the "separate but equal" doctrine, which has been emphatically rejected ever since Brown I. Unfortunately, this scenario more or less accurately describes the situation that has occurred in Louisiana today under the consent decree. The predominantly black schools complain that they do not have the same support and facilities as do the predominantly white schools and should be given more money to enhance such in order to encourage more blacks to attend better college; their concern appears to be in maintaining their positions and status rather than in achieving integration.
This Court does not mean to suggest that freedom of choice must be abandoned in the higher education context;[77] on the contrary, it is the very element, among others, wherein the consent decree as implemented has failed. For example, under the consent decree, certain UNO students were required without exception to take courses at SUNO, but corresponding SUNO students could avoid taking cross-courses at UNO. Although the State has the authority, and should be encouraged, to promote different and unique types of higher learning institutions, the State fails when it fosters two universities or colleges in close geographic proximity offering overlapping courses and programs  especially where one is predominantly black and one is predominantly white.
The Fifth Circuit has found schools that are 71% black to be "clearly racially identifiable"[78] and as such to be "just such a vestige [of a racially discriminatory, dual school system]."[79] The four state universities that were established as black schools remain from 87% to 97% black; those white, from 74% to 96% white. Contrary to the Court's earlier expectations, the consent decree as implemented has proved no viable solution. If anything, the consent decree has exacerbated the segregation; many of the schools are more racially polarized now than they were just *658 before the consent decree was implemented in 1981.
The United States suggests that a unitary system was not established under the consent decree because the State did not fully implement all the terms of the consent decree. While, primarily because of the State's recent economic downturn, the State did not spend all the money called for by the consent decree, the State did spend over $200 million towards the consent decree. It is now apparent that the failure was not in spending too little, but rather was in the entire structure of the consent decree. If money were the sole problem, then there should still be improvement, though perhaps an insufficient improvement for constitutional purposes, in the desegregation of Louisiana's public universities. The consent decree as implemented was directed more towards merely enhancing the State's black schools as black schools rather than towards "convert[ing] its white colleges and black colleges to just colleges."[80]
Without deciding at this time what remedy must be implemented, the Court does acknowledge that a drastic change may be required to remedy the remaining vestiges of the former de jure segregated system.[81] A possible remedy that suggests itself to the Court would be one that (1) reduces the number of senior colleges and many of their duplicative programs, in particular, to avoid the duplication in institutions in the same vicinity,[82] (2) institutes a system of a junior colleges with open admissions to all high-school graduates, (3) institutes higher minimum entrance requirements to the remaining senior colleges,[83] and (4) vests the State supervision over the institutions to a single board.

E.
In Part II(D) above, the Court held that the State by, through, and with its four higher education boards have failed to meet their obligations under Title VI. A separate question is involved, however, for Bossier Parish Community College (BPCC) and St. Bernard Parish Community College (SBPCC), which are under the aegis not of any of the four higher education boards, but of BESE and the two respective parish (primary/secondary education) school boards.
Plaintiff has submitted no opposition to the Bossier Parish School Board's summary judgment motion (which is joined by BESE) and further makes absolutely no mention of either BPCC or SBPCC in its summary judgment motion or in its accompanying documentation. As plaintiff's amended complaint acknowledges, both these schools were established after Title VI's enactment. The record in this matter includes no evidence whatsoever that these schools have any history of segregation and have operated on anything but a fully integrated basis and that their supervising boards, which are wholly separate from Louisiana's four higher education boards, have discriminated in any fashion against minorities.
The sole arguments in the record for including BPCC and SBPCC within the reach of any desegregation plan appear in plaintiff's unopposed, unverified November 1980 motion to add BESE, the two parish school boards, and the superintendents thereof as defendants to the action. Plaintiff alleges that the two schools are "traditionally white" institutions and that their joinder is necessary "to undertake a state-wide approach in disestablishing dual higher education systems."[84] These allegations *659 are insufficient to defeat the summary judgment motions for these two schools.[85] First, while the Civil Rights Restoration Act enlarged Title VI to a great extent, the enlargement was not without bounds; Title VI does not permit one school to come within a remedy for another school if the two schools are governed and funded by separate state agencies; whatever the wisdom of a state-wide remedy, the remedy can be no broader than is permitted by the statute providing the remedy. Second, a state-wide approach is only valid to the extent that the schools or their supervising boards are found to have once operated a segregated system.
In sum, because plaintiff has produced no evidence of a genuine dispute of material fact as to either BPCC or SBPCC, the Bossier Parish School Board and BESE are entitled to summary judgment on their motions. Because neither the St. Bernard Parish School Board nor its supervisor has moved for summary judgment, plaintiff may still present evidence at trial of any liability against those two.[86]

III.
For these reasons, the Court GRANTS plaintiff's motion in all respects except as to the Bossier Parish Community College and the St. Bernard Parish Community College, to which the Court DENIES plaintiff's motion; GRANTS the Bossier Parish School Board's and BESE's motion; and DENIES all remaining motions.
It is hereby ORDERED that a status conference be held before the Court in Judge Schwartz's chambers on Wednesday, August 24, 1988 at 3:15 p.m. for the purpose of discussing the upcoming trial on the issue of remedy.
NOTES
[1] Plaintiff suggests that there are only eleven institutions; it characterizes the eights schools within the LSU system and the three schools within the Southern University system as being just two "institutions" each with several campuses. See plaintiff's response to Regents Statement No. 1. Plaintiff offers no authority for its dispute with the state law designation of the schools in the LSU and Southern systems as being separate institutions. In any event, this semantic difference is immaterial to the issue at hand.
[2] SUBR and Grambling were designated as "black only" schools by statute. While the statutes creating SUNO in 1956 and SUSBC in 1964 do not specifically refer to these two schools as being for blacks only, Louisiana still officially treated these two schools as having been created to be "black schools." See Plaintiff's Statement No. 28; Regents' Reply to Plaintiff's Statement No. 29.
[3] E.g., Plaintiff's Statement Nos. 13, 21, 24; Regents' Reply to Plaintiff's Statement No. 29.
[4] Black students presently represent about one-third of the student body at Delgago. While this percentage is above the state-wide average of one-quarter, the Court cannot say it is disproportionately so, especially in light of the fact that New Orleans has a higher concentration of black citizens than is found state-wide.
[5] Attachment B to Exhibit 1 to Regents' statement of undisputed facts.
[6] See Consent Decree, Attachment 1, at 14-15.
[7] See, e.g., Consent Decree, Attachment 3, Fall 1985 UNO Class Bulletin at 5; Consent Decree, Attachment 4, Spring 1986 UNO Class Bulletin at 5. As the UNO and SUNO class bulletins in the record confirm, these class include certain sections of educational psychology, required for graduation by all education majors, and certain sections of high school teaching classes and of economic principles, both required for graduation for certain teaching fields.
[8] Compare UNO class bulletins ("Effective with the 1983 Spring Semester, a student will not be allowed to take a course for a degree credit at another college/university in the New Orleans area if that course is being offered at Southern University in New Orleans specifically for the University of New Orleans students.") with SUNO class bulletins ("A student registered at Southern University at New Orleans may not receive credits at Southern University of New Orleans for any work taken concurrently at another college or university or by correspondence study, without prior written approval of the Vice Chancellor of Academic Affairs."). In essence, SUNO students may obtain waivers from the exchange program while UNO students appear unable to do so.
[9] 356 F.Supp. 92, 94-95 (D.D.C.), aff'd as modified, 480 F.2d 1159, 1165 (D.C.Cir.1973).
[10] 42 U.S.C. §§ 2000d, 2000d-1 (1982).
[11] See La. Const. of 1974, art. 8, §§ 5-7.
[12] While the March 1976 motion to substitute defendants appeared to drop the individual board members of the various boards, the November 1980 amended complaint renames these members (as well as the members of BESE and the two parish school boards).
[13] See United States v. State of Louisiana, 527 F.Supp. 509 (E.D.La.1981).
[14] See United States v. State of Louisiana, 543 F.2d 1125, 1126 n. 2 (5th Cir.1976).
[15] Consent Decree, Introduction, at 1; see also id. at 1-2 ("It is the specific understanding of the parties and of this Court that neither this Consent Decree nor defendants' consent thereto constitutes an admission by defendants or an adjudication by the Court of any violation of law by defendants."); id., pt. VI, Nonadmission and Nondetermination, at 20.
[16] See United States v. Overton, 834 F.2d 1171, 1174, 1176 (5th Cir.1987); United States v. Lawrence County School District, 799 F.2d 1031, 1037 (5th Cir.1986).
[17] Lawrence County, 799 F.2d at 1037 & n. 5.
[18] See Overton, 834 F.2d at 1174.
[19] United States v. Marion County School District, 625 F.2d 607, 611-13 (5th Cir.1980), cert. denied, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981); Civil Rights Act of 1964, tit. VI, § 602, 42 U.S.C. § 2000d-1 (1982); see Cannon v. University of Chicago, 441 U.S. 677, 722 n. 9, 99 S.Ct. 1496, 1971 n. 9, 60 L.Ed.2d 560 (1979) (White, J., dissenting); 45 C.F.R. § 80.8(a); see also 28 C.F.R. § 50.3 (policy statement for enforcing Title VI).
[20] United States v. Tatum Independent School District, 306 F.Supp. 285, 288 (E.D.Tex.1969); see Marion County, 625 F.2d at 609-11, 617.
[21] Compare United States v. State of Mississippi, 229 F.Supp. 925, 975-76 (S.D.Miss.1964) (three-judge court) (Brown, J., dissenting) (United States has standing under the Fourteenth and Fifteenth Amendments to vindicate voting rights), majority opinion rev'd on other grounds, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) with United States v. Philadelphia, 644 F.2d 187 (3d Cir.1980) (United States has no standing under the Fourteenth Amendment) and United States v. Mattson, 600 F.2d 1295 (9th Cir.1979) (same) and United States v. Solomon, 563 F.2d 1121 (4th Cir.1977) (same); see also United States v. State of Alabama, 828 F.2d 1532, 1547 (11th Cir.1987) (per curiam) (United States conceding it had no standing on the Fourteenth Amendment claim), cert. denied sub nom. Board of Trustees of Alabama State University v. Auburn University, ___ U.S. ___, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).
[22] Marion County, 625 F.2d at 615 & n. 20.
[23] Id. at 617.
[24] See Message to the Senate on Civil Rights Legislation, 24 Weekly Compilation of Presidential Documents 353 (Mar. 16, 1988).
[25] Pub.L. No. 100-259, § 6, 102 Stat. 28, 31 (1988) (codified at 42 U.S.C. § 2000d-4a). The Act amends Title VI by adding at the end a section 606, which reads in pertinent part:

Sec. 606. For the purposes of this title, the term `program or activity' and the term `program' mean all the operations of
(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
. . . .
any part of which is extended Federal financial assistance.
[26] S.Rep. No. 64, 100th Cong., 1st Sess. 2 (1987), reprinted in 1988 U.S. Code Cong. & Admin. News 3, 4.
[27] 465 U.S. 555, 570-74, 104 S.Ct. 1211, 1220-21, 79 L.Ed.2d 516 (1984).
[28] Pub.L. No. 92-318, tit. IX, 86 Stat. 373-75 (codified at 20 U.S.C. §§ 1681-1686 (1982)).
[29] Memorandum in Support of Board of Regents' Motion for Summary Judgment, at 78 [hereinafter Regents' First Memorandum].
[30] Guardians Ass'n v. Civil Service Commission of the City of New York, 463 U.S. 582, 598-99, 103 S.Ct. 3221, 3230-31, 77 L.Ed.2d 866 (1982) (opinion of White, J.); id. at 633, 103 S.Ct. at 3249 (Marshall, J., dissenting); State of Alabama, 828 F.2d at 1547; see U.S. Const., art. 1, § 8, cl. 1.

This Court questions, without deciding, whether Congress also had authority under section 5 (the Congressional enforcement section) of the Fourteenth Amendment to enact Title VI. See The Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883).
[31] State of Alabama, 828 F.2d at 1546-51; see United States Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 604, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986); Grove City, 465 U.S. at 566, 104 S.Ct. at 1218 ("Title IX was patterned after Title VI"); see also Board of Public Instruction of Taylor County, Florida v. Finch, 414 F.2d 1068, 1076-78 (5th Cir.1969), cited with approval in North Haven Board of Education v. Bell, 456 U.S. 512, 538, 102 S.Ct. 1912, 1926, 72 L.Ed.2d 299 (1982).
[32] E.g., Grove City, 465 U.S. at 570, 104 S.Ct. at 1220 ("An analysis of Title IX's language and legislative history led us to conclude ..."); State of Alabama, 828 F.2d at 1549 ("Congress intended Title VI to apply to ...").
[33] 24 Weekly Comp. Pres. Docs. at 353 (emphasis in original) (describing a bill the President wanted passed in lieu of the Senate Bill that passed, S. 557). They agreed with the decision to overrule Grove City. Id.; Sen.Rep. 64, supra note 26, at 37 (minority view), reprinted in 1988 U.S.Code Cong. & Admin.News at 35. Their principal objection was that the amendment, as drafted, would interfere with the exercise of certain fundamental rights under the First Amendment, particularly, the freedom of religion. Id.; 24 Weekly Comp. Pres. Docs. at 354; see also Buckley, Double Talk on Civil Rights Act, (New Orleans) Times-Picayune, Mar. 26, 1988, at A-19, cols. 1-3.
[34] Regents' First Memorandum at 86.
[35] South Dakota v. Dole, ___ U.S. ___, ___, 107 S.Ct. 2793, 2796-97, 97 L.Ed.2d 171 (1987) (upholding the constitutionality of a federal statute conditioning states' receipts of highway funds on the adoption of a minimum drinking age of 21).
[36] Because defendants do not raise the issue and the issue does not otherwise appear applicable in this case, the Court expresses no opinion on the possible First Amendment objections raised by the President and others, see supra note 33.
[37] 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).
[38] Id. at 17, 101 S.Ct. at 1540 (citations and footnote omitted).
[39] Regents' First Memorandum at 82.
[40] See Grove City, 465 U.S. at 579, 104 S.Ct. at 1224 (Powell, J., concurring) (describing the inequities in having the college, against which there was not the slightest suggestion of any type of discrimination, comply with the myriad of federal reporting requirements under Title VI).
[41] See supra text accompanying note 22 and infra text accompanying notes 47-77.
[42] The Court observes that defendants' misplaced argument on remedy in no way depends on any changes brought about by the amendment to Title VI; any uncertainty about a particular remedial measure exists whether the measure is applied to one department of one school or to an entire school system.
[43] See also Bazemore v. Friday, 478 U.S. 385, 396, 106 S.Ct. 3000, 3007, 92 L.Ed.2d 315 (1986) (under Title VII, defendant had "an obligation to eradicate present salary disparities based on race that began prior to the effective date of Title VII").
[44] Regents' First Memorandum at 83.
[45] See Dole, ___ U.S. at ___, 107 S.Ct. at 2797.
[46] Even if the amendment to Title VI were unconstitutional so that the reach of Title VI was only to the extent defined in Grove City, it would not necessarily follow that the State's entire public university system would not come within the reach of Title VI. The record does not reveal whether federal education funds to the State are earmarked to specific, discrete programs or instead are, at least partially, nonearmarked so that the State can spend the federal funds in the system however the State and its boards sees fit. See, e.g., Grove City, 465 U.S. at 573, 104 S.Ct. at 1211 (distinguishing between "earmarked" and "nonearmarked" funds). To suggest that pre-amendment Title VI could not at times reach an entire education system would condemn the innumerable primary/secondary school system decrees wherein courts have ordered and administered system-wide desegregation plans.
[47] Brown v. Board of Education of Topeka, Kansas (Brown I), 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (overruling Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)).
[48] Brown v. Board of Education of Topeka, Kansas (Brown II), 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955).
[49] Milliken v. Bradley (Milliken II), 433 U.S. 267, 289-90, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977) (quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275 28 L.Ed.2d 554 (1971)); see Davis v. East Baton Rouge Parish School Board, 721 F.2d 1425, 1435 (5th Cir.1983) ("Until it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system.").
[50] Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
[51] Dayton Board of Education v. Brinkman (Brinkman I), 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (citing Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (an equal protection violation is not established merely by proving that a practice has a disproportionate impact on minorities)).
[52] United States v. Pittman, 808 F.2d 385, 393 (5th Cir.1987) (Higginbotham, J., concurring).
[53] See, e.g., Geier v. Alexander (Geier II), 801 F.2d 799, 802 (6th Cir.1986); Geier v. University of Tennessee (Geier I), 597 F.2d 1056, 1065 (6th Cir.), cert. denied, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); Lee v. Macon County Board of Education, 453 F.2d 524, 527 (5th Cir.1971) (per curiam); Ayers v. Allain, 674 F.Supp. 1523, 1551 (N.D.Miss.1987), appeal pending, No. 88-4103 (5th Cir.); United States v. State of Alabama, 628 F.Supp. 1137 (N.D.Ala.1985), rev'd on other grounds, 828 F.2d 1532 (11th Cir.1987), cert. denied sub nom. Board of Trustees of Alabama State University v. Auburn University, ___ U.S. ___, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); Norris v. State Council of Higher Education for Virginia, 327 F.Supp. 1368, 1373 (E.D. Va.) (three-judge court), aff'd per curiam without written opinion sub nom. Board of Visitors of the College of William and Mary in Virginia v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971); Alabama State Teachers Association (ASTA) v. Alabama Public School and College Authority, 289 F.Supp. 784, 787 (M.D.Ala.1968) (three-judge court), aff'd per curiam without written opinion, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969); Lee v. Macon Country Board of Education, 267 F.Supp. 458, 474, 484 (M.D.Ala.1967) (three-judge court) (per curiam), aff'd per curiam without written opinion sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); cf. United States v. LULAC, 793 F.2d 636, 648-49 (5th Cir. 1986); Adams v. Richardson, 480 F.2d 1159, 1164-65 (D.C.Cir.1973) (per curiam en banc).
[54] United States v. State of Louisiana, 527 F.Supp. 509, 514 (E.D.La.1981) (and cases cited therein); see also Geier I, 597 F.2d at 1065; Lee, 453 F.2d at 527; Ayers, 674 F.Supp. at 1553-54; ASTA, 289 F.Supp. at 787-88.
[55] Ayers, 674 F.Supp. at 1552.
[56] See id. at 1552-54; ASTA, 289 F.Supp. at 789-90; cf. Adams, 480 F.2d at 1165 & n. 11 (appearing to suggest that the existence of all-black public colleges is not only constitutional, but also, in the court's words, "crucial" for the viable training of minority students).
[57] Geier I, 597 F.2d at 1067; see Norris, 327 F.Supp. at 1372-73.
[58] 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).
[59] Id. at 406, 106 S.Ct. at 3012.
[60] Id. at 406, 106 S.Ct. at 3012.
[61] Id. at 408, 106 S.Ct. at 3013.
[62] Id. at 408, 106 S.Ct. at 3013.
[63] 674 F.Supp. 1523 (N.D.Miss.1987), appeal pending, No. 88-4103 (5th Cir.).
[64] Id. at 1553.
[65] Id. at 1554.
[66] Id.
[67] Geier v. Alexander, 801 F.2d 799 (6th Cir. 1986).
[68] Id. at 805.
[69] This Court does not mean to suggest that the ultimate holding in Ayers is, in this Court's view, in error. The facts in Mississippi's system are far more encouraging than Louisiana's. Among other things, Mississippi does not have three cities each with one "black" and one "white" college; with just eight senior colleges, Mississippi does not have the excessive program duplication found in Louisiana. Further, its faculty and student recruitment programs are far more developed than Louisiana's. Perhaps, Mississippi's apparent greater success lies in its establishment of numerous junior colleges and of its admissions requirements for its senior college.
[70] See Bazemore, 478 U.S. at 408, 106 S.Ct. at 3013. Plaintiff's position is curious, for if Bazemore applied, defendants would almost surely be entitled to summary judgment.
[71] Geier II, 801 F.2d at 801.
[72] Geier II, 801 F.2d at 802.
[73] For Louisiana's compulsory school attendance laws for children below the age of 17, see La.Rev.Stat.Ann. §§ 17:221-:237 (West 1982 & West Supp.1988). See also Livingston Parish School Board v. Lofton, 422 So.2d 1357, 1359 (La.App. 1st Cir.1982) (citing State v. Pettifield, 210 La. 609, 27 So.2d 424, 426 (1946)).
[74] See Wisconsin v. Yoder, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972) (citing Pierce v. Society of Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed.2d 1070 (1925)); see id., 406 U.S. at 239, 92 S.Ct. at 1545 (White, J., concurring) ("reemphasiz[ing] the legitimacy of the State's concern for enforcing minimal educational standards").
[75] Id. at 221, 92 S.Ct. at 1536; id. at 240, 92 S.Ct. at 1545 (White, J., concurring); see Brown I, 347 U.S. at 493, 74 S.Ct. at 691; see also Duro v. District Attorney, 712 F.2d 96, 97, 99 & n. 3 (4th Cir.1983), cert. denied, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 230 (1984); id. at 99-100 & n. 1 (Sprouse, J., concurring).
[76] Of course, there could be some freedom of choice, without the State maintaining separate but equal facilities, by providing a difference in support in faculty, facilities, and programs at the various state institutions along with open admissions policies. The absurdity of seriously espousing such a plan is so apparent that no further comment is required.
[77] See ASTA, 289 F.Supp. at 790.
[78] United States v. Lawrence County School District, 799 F.2d 1031, 1039 (5th Cir.1986).
[79] Id. at 1043.
[80] Norris, 327 F.Supp. at 1373 (citing Sanders v. Ellington, 288 F.Supp. 937, 942 (M.D.Tenn. 1968)).
[81] See Geier II, 801 F.2d at 802.
[82] See Ayers, 674 F.Supp. at 1541 ("this large amount of unnecessary duplication of programs at institutions which in some cases are less than 50 miles apart in sparsely populated areas is not a model of economic efficiency"); id. at 1540.
[83] Cf. LULAC, 793 F.2d at 649 (there is no duty for higher education to compensate for constitutional infirmities at secondary/primary levels).
[84] Memorandum of the United States in Support of Motion to Add Parties Defendant and for Leave to File Amended Complaint, at 7 (citing Richardson v. Blanton, 597 F.2d 1078, 1086-87 (6th Cir.), cert. denied sub nom. Tennessee Higher Education Commission v. Geier, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); Adams, 480 F.2d at 1164; Dep't of Health, Education and Welfare, Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 43 Fed.Reg. 6658, 6659 (Feb. 15, 1978)).
[85] See Celotex Corp v. Catrett, 477 U.S. 317, 323-325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986); F.R.Civ.P. 56(e).
[86] The Court is aware of the anomaly that may arise if plaintiff later presents sufficient evidence that the St. Bernard Board is liable under Title VI; the Court observes, however, that its grant of BESE's summary judgment is not being made under F.R.Civ.P. 54(b). To the extent that the interests of justice may require as much, this Court may reconsider, upon good cause shown, the summary judgment in favor BESE and the Bossier Board. The Court only emphasizes that the issue as to BPCC and SBPCC is wholly separate from those as to the 20 institutions under the four higher education boards' supervision.