**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 93-3061

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

STATE OF LOUISIANA, the Governor of Louisiana,
the LOUISIANA BOARD OF REGENTS, the BOARD OF
SUPERVISORS OF SOUTHERN UNIVERSITY and
AGRICULTURAL and MECHANICAL COLLEGE, the BOARD
OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and
AGRICULTURAL and MECHANICAL COLLEGE, and the
BOARD OF TRUSTEES FOR STATE COLLEGES and UNIVERSITIES.

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
(December 10, 1993)

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

DUHÉ, Circuit Judge:

The State of Louisiana and the four governing boards of its public colleges and universities ask that we reverse the summary judgment granted in this desegregation case, vacate the remedial order, and remand for trial. Because summary judgment was improperly granted, we vacate the remedial order, reverse the liability judgment, and remand.

## I. BACKGROUND

In the civil rights era Louisiana repealed its school segregation laws. The United States sued Louisiana in 1974 alleging that the State was still maintaining a racially

1

discriminatory system of higher education violating the Fourteenth Amendment[1] and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[2]

In 1981 the court entered a consent decree under which Louisiana was to begin affirmative action and enhance its predominately black public institutions of higher education. In December 1987 the United States moved for a hearing to determine Louisiana's compliance with this consent decree and to determine whether the State and the governing boards of its colleges and universities were operating its system of public higher education on a unitary basis.

The parties filed cross-motions for summary judgment on the issue of liability, i.e., the question whether the State maintained an unlawfully segregated system of higher education. The district court ruled for the United States, holding that the State had under

---

[1] The United States has since waived its constitutional claim. Upon a challenge to the United States' standing to assert a Fourteenth Amendment violation, the district court correctly determined that the Title VI standard was the same as the constitutional standard. United States v. Louisiana, 692 F. Supp. 642, 649-50 (E.D. La. 1988); see also United States v. Fordice, 112 S. Ct. 2727, 2738 n.7 (1992) ("[T]he reach of Title VI's protection extends no further than the Fourteenth Amendment."); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) (Title VI proscribes "only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment"); 438 U.S. at 352 (Brennan, White, Marshall, and Blackmun, JJ., concurring in part and dissenting in part) ("Title VI's standard . . . is no broader than the Constitution's.")

[2] This provision states, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

the consent decree failed to dismantle its racially dual structure. United States v. Louisiana, 692 F. Supp. 642, 653-57 (E.D. La. 1988) (sometimes called the "1988 liability order"). Following lengthy hearings before a special master on the question of remedy, the district court directed the State to implement the special master's recommended remedial plan as modified. United States v. Louisiana, 718 F. Supp. 499, 515-21 (E.D. La. 1989). Primarily this 1989 remedial order required consolidation of the State's four higher education boards into a single board, classification of the institutions by selective admissions and separate mission statements, a comprehensive community college system, and consolidating measures such as program transfer. Id. at 515-19.

During the appeal and remand of the remedial order, this Court decided Ayers, which held that a race-neutral admissions policy satisfies a state's obligation to desegregate. Ayers v. Allain, 914 F.2d 676 (5th Cir. 1990) (en banc). Considering Ayers and Louisiana's open admissions, the district court then vacated its earlier orders and granted summary judgment in favor of the State Defendants. United States v. Louisiana, 751 F. Supp. 606, 608 (E.D. La. 1990). When Ayers was reversed, United States v. Fordice, 112 S. Ct. 2727 (1992), this Court vacated the new summary judgment and remanded for reconsideration in light of Fordice.

The district court then ordered the parties to show cause why its 1988 liability order should not be reinstated and a revised remedial order should not be entered in light of Fordice. After responses were filed, the district court reinstated the 1988

3

liability order and entered another revised remedial order (the "1992 order").  The State Defendants appeal.

## II.  JUSTICIABILITY OF LIABILITY

In a separate appeal, the Southern University Board of Supervisors complains that the district court lacked jurisdiction to abrogate the 1981 consent decree because the validity of the consent decree was not a justiciable case or controversy.

The Southern Board argues that the only dispute about the consent decree was whether the State had complied with it--not its validity or terms.  This is inaccurate.  Near the end of the term of the consent decree, when the United States moved for a determination of Louisiana's compliance with the consent decree, it also requested a hearing to determine "whether defendants . . . are operating the system of public higher education on a unitary basis" and requested an order maintaining jurisdiction over the entire litigation.  The consent decree provided for the court's continuing jurisdiction "to insure that the Louisiana system of public higher education is operated on a unitary basis in all respects."  The consent decree also provided that the Plaintiff could before December 31, 1987 request the court to determine whether Defendants were operating the system of public higher education on a unitary basis.  This is precisely what the United States did.

After the motions for summary judgment were filed, the district court noted that the consent decree "was directed more towards merely enhancing the State's black schools as black schools rather than towards 'convert[ing] its white colleges and black

4

colleges to just colleges.'" 692 F. Supp. at 658 (footnote omitted). The court found a continuing constitutional violation, concluded that the consent decree had not dismantled the dual system, and that a more effective remedy was required.

The Southern Board's argument that the court lacked jurisdiction because it sua sponte took a question about which there was no case or controversy is without merit. The parties could not agree on whether the State had dismantled its dual system. By the terms of the consent decree, no determination of whether Defendants violated any law had been made. The United States' motion put at issue the efficacy of the consent decree in achieving a unitary system. The court retained jurisdiction to address this issue and properly reviewed the entire question whether the Defendants were maintaining an unconstitutional dual system.

III.   THE END OF THE CONSENT DECREE

The Southern Board next argues that the court's reason for invalidating the consent decree in 1988--the continued racial identifiability of the institutions--was erroneous in light of the 1992 decision in Fordice. The Southern Board is vague on what relief it is requesting from this Court, but apparently it desires reinstatement of the consent decree.

The Southern Board's argument centers on how Fordice changes a state's accountability for failure to obtain racially homogenized schools in the higher education context. We agree that racial identifiability, while relevant under Fordice, does not define the

5

standard for determining whether a state has dismantled its dual system (or whether a consent decree has been effective to achieve a unitary system).  As of 1992 Fordice provides the standard by which to determine whether the state is maintaining an unlawful dual system, and the United States is now entitled to another hearing on the question of the State's liability, as discussed next.  But the Fordice decision does not breathe any new life into the consent decree.

## IV.  FORDICE ISSUES

The State first contends that the district court based its liability decision on nothing more than the racial identifiability of the institutions, even though Fordice established a stricter standard for holding a state liable for unlawful segregation.  The State argues that the 1988 liability order was based solely on racial identifiability of the schools and boards.  The Southern Board also argues that the court misinterpreted Fordice by presuming unlawful segregation exists if the schools are racially identifiable.

### A.  The Standard:  More than Racial Identifiability

We agree with the State Defendants that under Fordice, "[t]hat an institution is predominately white or black does not in itself make out a constitutional violation." Fordice, 112 S. Ct. at 2743.  Under Fordice liability is based on specific state policies or practices:  "[A] State does not discharge its constitutional obligations [to dismantle its prior dual university system] until it eradicates policies and practices traceable to its prior de jure

6

dual system that continue to foster segregation."  Id. at 2735.

> If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects--whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system--and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system.

Id. at 2737.  We read Fordice to require that each suspect state policy or practice be analyzed to determine whether it is traceable to the prior de jure system, whether it continues to foster segregation, whether it lacks sound educational justification, and whether its elimination is practicable.  This is the State's burden to show that it has dismantled its prior dual system at the liability stage of litigation.

We read Fordice to also mandate inquiry into the soundness of the educational justification for challenged policies and the practicability of eliminating them in consideration of remedy once liability is found.  According to Fordice, "the State may not leave in place policies rooted in its prior officially-segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be *eliminated without eroding sound educational policies*."  Id. at 2743 (emphasis added).  Fordice also directs that "[i]f policies traceable to the de jure system are still in force and have discriminatory effects, those policies . . . *must be reformed to the extent practicable and consistent with sound educational practices*."  Id. at 2736 (emphasis added).

We interpret these directives as recognizing the need to

7

consider the practicability and soundness of educational practices in determining remedies as well as in making an initial determination of liability. We do not read Fordice as prohibiting a bifurcated determination of liability and remedy, although some matters may be pertinent to both aspects of the trial.

We agree with the State that the 1988 liability order was based on the undisputed fact of the persistent racial identifiability of Louisiana's public colleges and universities, despite the efforts under the consent decree. 692 F. Supp. at 644-46. The reinstatement of the 1988 liability order in 1992, however, was based on more than the undisputed facts that were before the court in 1988 when it first found liability. In 1992, the district court also considered the record created in the remedial hearings before the special master in 1989 and the remedial proceedings before the district court following the special master's report.

The district court found, "based on the entire record []including the most recent submissions," 1) that the State "continues to act through its policies and practices in a manner that promotes segregation . . .; 2) those policies and practices are traceable to Louisiana's long history and endorsement of segregation; and 3) Louisiana's policies and practices are without sound educational justification and can be practically eliminated." 1992 order at 17 (footnotes omitted). This holding demonstrates that in its 1992 order the court reinstated the 1988 liability summary judgment based on more than the racial composition of the

8

schools. The court considered the requirements of <u>Fordice</u> in determining liability in 1992.

### B. Specific Analysis Required

The State also challenges the summary judgment liability ruling on the ground that the court's findings[3] are too generalized to satisfy <u>Fordice</u>, because they do not specifically identify state policies and practices that extended the effects of past discrimination. The district court recited these general findings only after adopting the findings made in the earlier proceedings. 1992 order at 17 (adopting by reference the court's "findings of fact as set forth in its prior opinions and orders and reasons"); <u>see also</u> <u>id.</u> at 2 (parties overlooked court's "findings relative to the issue of liability"); <u>id.</u> at 12-14 (refusing to regard the court's earlier findings as outdated). The court stated, "[W]hen the record in this case is viewed as a whole, the analytic framework and requisite factual inquiries now required as articulated in <u>Fordice</u> were made by this Court long before it had the benefit of the Supreme Court's guidance." <u>Id.</u> at 17.[4]

---

[3] Federal Rule 52 does not require a court to make findings on a Rule 56 motion, because "findings" imply decisions on disputed facts. <u>See</u> Fed. R. Civ. P. 52(a). On a summary judgment motion a court may, however, set forth as "findings" the facts which it considers undisputed on which its decision turns, as Judge Schwartz has done in this case. Such a practice is "greatly helpful to the appellate court in making clear the basis for the trial court's decision." <u>United States for the Use and Benefit of Indus. Instrument Corp. v. Paul Hardeman, Inc.</u>, 320 F.2d 115, 116 (5th Cir. 1963).

[4] The court also said its "considered decision with respect to remedy necessarily involved inquiry into such matters as educational soundness of current state policies and the practicability of dispensing with them; the very same issues

9

Assessing the 1992 order in the framework of the adopted earlier opinions, we perceive that the district court indeed considered individual policies and practices with sufficient specificity to satisfy Fordice, namely, Louisiana's open admissions policy, and program duplication in proximate institutions.[5] The court also considered the four-board governance of Louisiana's institutions of higher education.

In its 1989 remedial order the court found that "the racial identifiability of Louisiana's state universities is especially evident in the coexistence of predominantly black institutions (PBIs) and predominantly white institutions (PWIs) in close geographic proximity in four areas of the state." 718 F. Supp. at 504. The court found that program duplication at proximate institutions has a "stultifying effect on desegregation," and "permits schools to cater to students of one race, thereby hindering desegregation goals." Id. at 513. In 1992 the court found that Louisiana has continued its dual system, "perpetuated by duplicative programs, multiple boards, coexistence of PBIs and PWIs with similar programs existing in close proximity to each other." 1992 order at 13. These findings sufficiently identify program duplication in proximate institutions as a policy that fosters segregation today.

_____

considered in Fordice." 1992 order at 14-15.

[5] By "proximate institutions" we mean the four pairs of Louisiana institutions that are nearby each other, one of which is a predominantly black institution (or PBI), and one of which is a predominantly white institution (or PWI), namely, UNO and SUNO, LSU-BR and SU-BR, LSU-S and SUSBO, Louisiana Tech and Grambling.

We also find Fordice's "traceability" requirement implicit in the district court's analysis. The Supreme Court has concluded that program duplication between a historically white college and a historically black college in Mississippi was part of that state's prior dual system: "the whole notice of 'separate but equal' required duplicative programs in two sets of schools--and . . . the present unnecessary duplication is a continuation of that practice." Fordice, 112 S. Ct. at 2741. When the proximate PBIs and PWIs in Louisiana were historically segregated by law, program duplication was intentional--to insure that the two sets of schools were "separate but equal."

The court also at least implicitly considered whether program duplication in proximate institutions lacks sound educational justification, in observing that program duplication is excessive, unnecessary, costly, and inefficient. 718 F. Supp. at 508, 513 Finally, the court concluded that program duplication could be practicably eliminated, through elimination of the multi-board structure that would enable program transfers and program elimination, and through tiering or classifying institutions by selective admissions standards and revised mission statements. 718 F. Supp. at 509-13.

That unnecessary program duplication in proximate PBIs and PWIs was considered by the district court to be an unlawful policy or practice is readily apparent from its findings. Accordingly, with respect to this practice, we reject the challenge that the court rendered its liability judgment on findings that were too

11

generalized.  The district court indeed analyzed with sufficient specificity under Fordice the State's continuing program duplication in proximate PBIs and PWIs as an unlawful practice.

The district court also criticized both the four-board governance and the open admissions policies of Louisiana's institutions of higher education as policies or practices which violate the Fordice standard.[6]  Under Louisiana's governance system, a Board of Regents has overall authority, while three governing boards manage specific colleges and universities.  The remedial order disbands the four boards and orders a single board.

The United States has not challenged the four-board governing system as unlawful, but the court nevertheless found that the governance system violates the federal constitution.  718 F. Supp. at 505; see also 1992 order at 15-16 (quoting its earlier findings regarding the multi-board structure as an example of the sufficiency of its findings to support a liability decision under Fordice).  The Southern Board maintains that the constitutionality

_____

[6]  1992 order at 15-17.  Much of the criticism of both the multi-board system and the open admissions policies was that they foster program duplication and inefficiencies, and that their elimination would help resolve the problem of program duplication.  For example, the court found that the four-board system "led to unnecessary . . . program duplication" and that to an extent program duplication "results from the multi-board structure."  Id. at 15 (quoting 718 F. Supp. at 508).  As for the open admissions policy, the court noted that this policy fails to organize students by academic ability, resulting in program inefficiencies and the necessity that each institution provide remedial programs.  Id. at 16 n.47 (quoting 718 F. Supp. at 510 n.19).

We express no opinion whether a remedial order addressing an unlawful policy, if any is found on remand, might include a restructuring of the multi-board system or the open admissions policy if these are not independently found to be unlawful policies.

12

of the four-board system cannot be determined under <u>Fordice</u>, because the challenged four-board system is not a "policy or practice" but a state constitutional provision.

We agree. The Louisiana Constitution of 1974 created the four-board system, La. Const. art. VIII, §§ 5-7; <u>id</u>. art. XIV, §§ 1-5 (transitional provisions); and laws have been enacted to carry these provisions into effect. <u>E.g.</u>, La. Rev. Stat. Ann. §§ 17:1453-1555, 1831-54, 3121-33, 3215-22, 3351 (West 1982 & Supp. 1993). This court is not convinced that the <u>Fordice</u> analysis is applicable to determine whether the establishment of the four boards is unlawful. <u>Fordice</u> addresses the "surviving aspects of [the State's] prior dual system," <u>Fordice</u>, 112 S. Ct. at 2738; thus <u>Fordice</u> comes into play when the segregative laws have been repealed, but policies and practices traceable to the <u>de jure</u> dual system subsist. The four-board system of governance created by the State constitution in 1974 is not such a surviving "policy or practice" within the meaning of <u>Fordice</u>. Its constitutionality is determined under different principles.

"[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." <u>Washington v. Davis</u>, 426 U.S. 229, 240, 96 S. Ct. 2040, 2048 (1976). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." <u>Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 265, 97 St. Ct. 555, 563 (1977). This same analysis applies to a provision in a state constitution.

13

<u>Hunter v. Underwood</u>, 471 U.S. 220, 227-28, 105 S. Ct. 1916, 1920 (1985) (applying approach of <u>Arlington Heights</u> to determine whether state constitutional provision violated the Equal Protection Clause).

The court found the four-board system unconstitutional without analyzing the State's constitutional provisions or the laws effectuating them under traditional equal protection principles, such as whether a provision has a disproportionate impact that can be traced to a discriminatory purpose.[7] The judgment is therefore reversed, because the court did not apply the correct legal standard in holding that the four-board system is unconstitutional.

The court also recognized Louisiana's open admissions policy as a policy which is "counter-productive . . . in terms of . . . racial integration." 1992 order at 15-16 (quoting 718 F. Supp. at 510). This finding addresses the <u>Fordice</u> inquiry whether the

---

[7] The court found that the multi-board governing system has "perpetuated" and "sustain[ed]" a segregated higher education system. 718 F. Supp. at 505; 1992 order at 16 n.47. It also found that the organization of the institutions of higher education under four boards had "little regard for logic or efficiency" (1992 order at 16 n.47); and that the existence of four boards impairs the State's ability to enhance its historically black institutions (both by dissipating scarce resources and by leaving the State without an organizational structure with the power to make program decisions statewide or power to give desirable programs to the historically black institutions) (1992 order at 15 (quoting 718 F. Supp. at 508)). After considering comparisons with alternative systems, the court concluded that the multi-board system could be eliminated in favor of a "single-board solution," and by organizing the institutions under a "mission assignment framework" instead of under the framework of the four boards. 1992 order at 15 (quoting 718 F. Supp at 508), 16 & n.47. This analysis approaches that of <u>Fordice</u>, and the findings are persuasive, but the court did not analyze the question whether the four-board system is traceable to <u>de jure</u> segregation in Louisiana.

14

state's open admissions policy fosters segregation. As for educational justification, the court noted that the open admissions policy fails to meet the educational objective of producing graduates, and that the policy is inefficient in failing to organize students by academic ability. Id. The court found tiering the institutions by selective admission standards and classifying them by revised mission statements to be feasible alternatives to open admissions at every institution. More specific consideration of the practicability of eliminating the policy is not required under Fordice.

The open admissions policy was instituted after Louisiana's de jure segregation ended, and the court failed to address the policy's traceability to the state's prior de jure system. Under Fordice, a policy is unconstitutional only if "traceable to its prior [de jure] system." Fordice, 112 S. Ct. at 2737. The question whether Louisiana's open admissions policy meets the Fordice traceability requirement must be resolved (if challenged) on remand. "[I]f challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles." Fordice, 112 S. Ct. at 2737 n.6.

In sum, we find that the district court adequately applied Fordice to the State's practice of continuing program duplication in proximate institutions and to the State's open admissions policy, except with respect to the traceability of the open admissions policy. The constitutionality of the four-board

15

governance system was not determined under the appropriate legal principles.

## C.   Disputed Facts

The State also challenges the summary judgment findings on the ground that they are based on disputed facts.  The State and the Southern Board urge that reinstatement of summary judgment on liability was inappropriate because some Fordice issues remain genuinely disputed.  The district court relied on the special master's determinations of factual issues after the remedial hearings and reinstated the summary judgment based in part on those findings without holding another evidentiary hearing.  According to the United States, however, summary judgment on these findings is proper because the findings are based on undisputed evidence, largely the State's own evidence.  Yet the State Defendants insist that the court did not rely on undisputed facts, because the special master's findings were based on controverted evidence.

Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Evidence adduced at a hearing may support a summary judgment when the testimony is uncontradicted and the factual basis for judgment admits no genuine controversy about material matters.  Peyote Way Church of God, Inc. v. Smith, 742 F.2d 193, 196 (5th Cir. 1984).  We must review the facts drawing all inferences most favorably to the party opposing the motion. Reid v. State Farm Mut. Auto. Ins. Co., 784 F.2d 577, 578 (5th Cir.

16

1986).

The United States Government's expert, Dr. Clifton Conrad, found unnecessarily duplicative programs at proximate PBIs and PWIs and concluded that the State is maintaining a racially dual system of higher education. The Board of Supervisors' expert, Dr. Donald Smith, criticized as inaccurate Dr. Conrad's definition of "duplication"--as programs in two or more nearby institutions in the same program category or subprogram category of the HEGIS data.[8] Dr. Smith notes that the HEGIS categories provide very little information about the content of a program. See also Dep. of Roy E. McTarnaghan of Apr. 21, 1981, filed Sep. 4, 1981, at 117 ("[F]requently courses that . . . are titled quite differently are much more the same than those that are titled the same."). In Dr. Robert Berdahl's opinion, whether a program offered at one institution in fact duplicates a program offered at another institution cannot be determined "without doing a detailed onsight inspection the way accrediting teams do. But just reading from the college catalog or reading a HEGIS number . . . seems a terribly simplistic way to say these are duplicate programs."

Dr. Smith also criticizes Dr. Conrad's definition of "unnecessary"--as carrying a program title outside the list Dr. Conrad defines as "core." Cf. Conrad's Louisiana Curriculum Analysis. In Dr. Smith's opinion, Dr. Conrad's definition of an

---

[8] The acronym stands for Higher Education General Information Survey. This was a compilation by the Department of Education of statistics and information supplied by the institutions of higher education to the federal government.

17

"unnecessary" program would not agree with a college's own list of which of its offerings were not "essential." Similarly, Dr. Berdahl believes that Dr. Conrad "takes a grossly over-simplified approach to defining unnecessary program duplication," partly because Dr. Conrad does not consider student need in defining necessary.[9] In Dr. Smith's opinion, a finding of "unnecessary duplication" could be made only by examining a set of offerings in a particular setting, considering the educational mission of an institution.

This evidence leaves room for different inferences: we find that a question of fact remains whether unnecessary program duplication exists in Louisiana's colleges and universities.

We also detect fact issues regarding the practicability of eliminating program duplication. Dr. Smith notes the reluctance of faculty to accept transfer or of faculty at a transferee university to receive transferring faculty happily. He also asserts that a program cannot be moved without materially changing its substance,

---

[9] Dr. Berdahl explained,

> To merely take the idea of every institution should offer a general education core of subjects, but that anything they offer beyond that at the Bachelor's level and then all masters and then all doctoral duplication, is by definition unnecessary, seems to me to play fast and loose with the word unnecessary. . . . [Conrad says] that he did not at all consider student need, which is universally . . . considered a vital element in whether or not a program duplication is necessary or unnecessary.

Dr. Berdahl would define "unnecessary" program duplication beginning with a composite profile of what a "normal" four year college offers, which "would go far beyond the minimum core of general education." To define the term unnecessary he would consider not only this composite profile but also student need, quality, and state's ability to pay.

in part because of the interactions between the courses in a program with the content of other courses offered at the same school.

Dr. Smith believes that program transfer would damage the quality of the programs and of the university.[10] The State adduced evidence that program transfers at two Georgia colleges resulted in a drop in enrollment at both schools and failed to achieve the expected transfer of students from one to the other.[11] Dr. Cameron Fincher testified that in Georgia, "what they thought to be the program included more than what was transferred." Fincher Dep. at 79. Besides courses in the major field, other courses have to be taken. Id. at 79-80. He concluded that after reciprocal program transfers from two institutions, "the quality of both programs has been somewhat shaken because of the transfer." Id. at 81.

---

[10] This factual dispute was further highlighted by the testimony of Dr. Berdahl. Berdahl believes that in implementing program transfers,

> we are doing no favor to either the students who might get hurt in the process of massive social engineering or to the institutions that we are trying to pull programs out of an organic context and graft them into a different situation. . . . Program clusters, you know, programs are related to each other.

[11] See Dep. of Dr. Cameron Fincher of Jun. 4, 1981, filed Sep. 4, 1989, at 61-63. Individual choice of students defeated the plan to desegregate: students selected "surrogate majors" at the school of their choice rather than transferring to the school with the first-choice major. Id. at 76-77. For example, athletes who wanted a major in physical education, a program removed to a different college, simply found a major in a related field such as "recreation and/or parks administration" at their home institution rather than changing their selection of college. Id. Dr. McTarnaghan observed a similar reaction by students to terminating or transferring duplicative programs in Florida: students would remain loyal to their institution and change majors. McTarnaghan Dep. at 68-69, 218-19, 225.

19

Inasmuch as this testimony defines a dispute about the practicability of program transfer, it seems at first to raise a remedial rather than a liability issue. (Program transfer was one of several suggested remedies for unnecessary program duplication, along with merger, cooperative programs, and program termination accompanied by establishing new programs.) But we think this testimony also bears on the liability determination of the practicability of eliminating unnecessary program duplication in proximate institutions. To ascertain the feasibility of eliminating or remediating a policy, one can scarcely ignore the feasibility of alternative or remedial measures. The conflict in testimony about program transfers thus reveals a disputed issue regarding the practicability of eliminating duplicate programs.

As for the educational justification for maintaining duplicate programs at proximate institutions, the district court found that program duplication was excessive, costly, and inefficient. The State has not specifically pointed out evidence which raises a question of fact regarding the educational soundness of maintaining duplicate programs at proximate PBIs and PWIs. Instead the State argues that the district court acknowledged a disputed issue regarding the educational justification for the continued existence of the proximate institutions in the following remark: "Among the problems [of merging proximate institutions] are merging student bodies of highly disparate academic backgrounds, potential loss of qualified faculty and administrators who were attracted to a school because of its academic characteristics and goals, and undermining

20

black institutions such as Grambling and Southern with substantial alumni following." 718 F. Supp. at 507 (rejecting merger as a possible remedy).

Does this observation by the district court imply a disputed question whether some educational justification for continuing duplicate programs in proximate institutions may exist? We think so, though our decision is made more difficult by the State's failure to point out the evidence which demonstrates a disputed issue. Implicit in the court's remark is the suggestion that continuing duplicate programs at proximate institutions might advance the educational goals of classifying students by their level of preparedness and of retaining qualified faculty and administrators at the schools which originally attracted them. A factfinder might infer that the advancement of these educational goals provides sound educational justification for continuing duplicate programs in side-by-side institutions. Though we consider the issue to have been inadequately addressed by the parties, we discern an issue of fact regarding the soundness of educational justification for continuing duplicate programs.

Because of the disputed fact questions whether unnecessary program duplication in proximate institutions violated Fordice, the court improvidently rendered summary judgment on that basis.

Also, as noted previously, the open admissions policy was instituted after Louisiana's de jure segregation ended. We think this fact inherently raises a genuine issue for trial because it permits an inference that the open admissions policy is not "rooted

21

in" the State's prior <u>de jure</u> segregated system.  The question whether the open admissions policy meets the <u>Fordice</u> traceability requirement must be resolved (if challenged) on remand.

We also find a fact issue whether an open admissions policy fosters segregation.  The district judge and the special master reached different conclusions about whether changing the open admissions policy to a tiered system with graduated admission requirements would affect desegregation efforts.  The special master found, "[t]here is no obvious and necessary connection between organization and desegregation. . . . Thus how state universities are organized can be viewed as an educational matter not rising to constitutional levels."  The district court concluded, however, that open admissions is "counter-productive . . . in terms of . . . integration."  1992 order at 15-16.  Though the burden of pointing out issues of fact generally rests with the non-moving party and the State has suggested no conflicting evidence on the point, we cannot help but find a fact issue because of the special master's and trial court's differing "findings."  No party has suggested any issue of fact regarding educational justification for or the practicability of eliminating the open admissions policy, and we discern none.

We greatly respect the district court's diligence in attempting to resolve this protracted litigation expeditiously.  We also commend the trial judge for his obvious familiarity with the massive record in this case and his circumspection in attempting to frame remedial measures.  In such an old case, where the state's

22

colleges and universities remain starkly racially identifiable, we remand for continued litigation with great reluctance. But in reviewing the reinstatement of summary judgment, we have ascertained disputed material facts. To the extent that genuine issues of fact remain on the liability issues noted above, the summary judgment on liability must be reversed.

## V.   DUE PROCESS

The Southern Board and the State also argue that using evidence from the pre-Fordice remedial proceedings to determine liability under Fordice denied the State defendants due process. The gist of this complaint is that the State Defendants had no reasonable opportunity to contest liability under the Fordice standards. Because of our remand today the State defendants will have the opportunity to develop the record on the disputed Fordice issues and the due process violation, if any occurred, will be cured.

## VI.   REMEDIAL ISSUES

Because of the existence of factual disputes on liability, the remedial order is vacated and we do not reach the State Defendants' final assigned errors relating to remedy, with the single exception of one which has been previously decided. The Southern Board of Supervisors argues that a single district judge lacks authority to enjoin the enforcement of the state constitutional provision setting forth the four-board governing structure of Louisiana higher education, citing 28 U.S.C. § 2281 (repealed 1976). The statute provides that an injunction restraining the enforcement of

23

a state statute on a ground of unconstitutionality should not be granted unless the application has been . . . determined by a three-judge district court."

Though originally a three-judge district court ordered the single-board remedy in the 1989 remedial order, 718 F. Supp. at 515-16, the later modified remedial orders embracing a single-board system were single-judge matters. After the three-judge panel's remedial order, the State and the Southern Board filed direct appeals in the Supreme Court. On the United States Government's motion to dismiss on the ground that the three-judge court was not required, the Supreme Court dismissed the appeals for want of jurisdiction. 110 S. Ct. 708 (1990). This Court stated that the Supreme Court's dismissals were predicated on the implicit conclusion "that the case in the district court was not properly a three-judge district court case" under former § 2281. We agree with the interpretation of the earlier appellate panel that considered the matter.

CONCLUSION

We reverse the summary adjudication of liability, vacate the remedial order, and remand for a determination of liability, and remedy if necessary, after resolution of any remaining factual disputes.

Remedial order VACATED; summary judgment on liability REVERSED; REMANDED.