**F I L E D**

REVISED SEPTEMBER 17, 2004

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 03-10711

---

NORMA McCORVEY, FORMERLY KNOWN AS JANE ROE,

Plaintiff-Appellant,

versus

BILL HILL, DALLAS COUNTY DISTRICT ATTORNEY,

Defendant-Appellee.

---

Appeal from the United States District Court
For the Northern District of Texas

---

Before JONES, WIENER, and PRADO, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case arises from the district court's denial of McCorvey's motion for relief from judgment pursuant to Fed. Rule Civ. Proc. 60(b). For the reasons set forth below, we dismiss.

## BACKGROUND

Norma McCorvey filed a Rule 60(b) motion for relief from judgment in which she sought to have the district court revisit the Supreme Court's decision in Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed. 2d 147 (1973). McCorvey, her identity then protected as "Jane Roe," was the named appellant in Roe. The district court

denied McCorvey's motion after concluding that it was not filed within a reasonable time after final judgment was entered.[1]

## DISCUSSION

We review the district court's denial of relief under Rule 60(b) for abuse of discretion. See Halicki v. Louisiana Casino Cruises, Inc., 151 F.3d 465, 470 (5th Cir. 1998); Flowers v. S. Reg'l Physician Servs., Inc., 286 F.3d 798, 800 (5th Cir. 2002). The district court's denial of an evidentiary hearing is also subject to abuse of discretion review. See Wichita Falls Office Assocs. v. Banc One Corp., 978 F.2d 915, 918 (5th Cir. 1992).

On appeal, McCorvey: (1) asserts that the district court improperly refused to convene a three-judge court; (2) challenges the district court's ruling on her Rule 60(b) motion; and (3) contends that she was entitled to an evidentiary hearing on her Rule 60(b) motion. We address each issue in turn.

### A. Three-Judge Panel

Roe v. Wade proceeded before a three-judge district court empaneled pursuant to 28 U.S.C. § 2281. See 28 U.S.C. § 2281 (1970); 28 U.S.C. § 2284 (1970) (controlling the composition and procedure of three-judge district courts). Before its repeal,[2] § 2281 required a three-judge district court to hear and determine cases involving injunctions against the enforcement of state

---

[1] We dispensed with oral argument in this case because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. FED. R. APP. P. 34(a)(2).

[2] PUB. L. 94-391, AUG. 12, 1976, 90 STAT. 1119.

statutes based on allegations of unconstitutionality. See Corpus v. Estelle, 551 F.2d 68, 70 (5th Cir. 1977). McCorvey asserts that the single district court judge, who ruled on her Rule 60(b) motion, acted without authority. We disagree.

Although the original action was tried by a three-judge district court, the Rule 60(b) motion filed by McCorvey in 2003 was not properly a matter for a three-judge court. In United States v. Louisiana, 9 F.3d 1159, 1171 (5th Cir. 1993), this court ruled, in another action determined under § 2281 by a three-judge court, that a single district court judge, acting alone after the repeal of § 2281, could properly entertain and decide subsequent modified remedial orders. The instant context is no different: A single district court judge can decide threshold questions relating to McCorvey's Rule 60(b) motion even though the underlying judgment was originally tried by a three-judge court under the former § 2281. See, e.g., Bond v. White, 508 F.2d 1397, 1400-01 (5th Cir. 1975).

## B. Rule 60(b)

McCorvey argues that the district court abused its discretion in rejecting her Rule 60(b) motion for relief from judgment as untimely. A question necessarily antecedent to McCorvey's substantive claim, however, is whether she has presented a justiciable case or controversy pursuant to Article III of the Constitution. We are under an independent obligation to examine this jurisdictional question.

3

There are two conceivable bases for concluding that McCorvey does not present a live case or controversy — lack of standing and mootness.  As the Supreme Court explained in <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.</u>, 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L.Ed. 2d 610 (2000), standing and mootness are related, but distinct, concepts.  We may pretermit the question of standing if we find a case clearly moot.  <u>See</u>, <u>e.g.</u>, <u>Nomi v. Regents of Univ. of Minn.</u>, 5 F.3d 332, 334 (8th Cir. 1993).

The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit . . . including the pendency of the appeal."  <u>Cook v. Colgate</u>, 992 F.2d 17, 19 (2d Cir. 1993) (citing <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 395, 100 S. Ct. 1202, 1209 (1980)) (other citations omitted); <u>see also</u> <u>Rocky v. King</u>, 900 F.2d 864, 866 (5th Cir. 1990) (controversy must remain "live" throughout the litigation process).  Mootness is the fatal issue for McCorvey.

"In general, a matter is moot for Article III purposes if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  <u>Sierra Club v. Glickman</u>, 156 F.3d 606, 619 (5th Cir. 1998).  Suits regarding the constitutionality of statutes become moot once the statute is repealed.  <u>See</u> <u>Diffenderfer v. Cent. Baptist Church</u>, 404 U.S. 412, 414-15, 92 S. Ct. 574, 575-76 (1972); <u>see also</u> <u>Fed'n of Adver. Indus. Executives, Inc. v. City of Chicago</u>, 326 F.3d 924, 930 (7th Cir. 2003) ("[W]e, along with all the circuits to address the

4

issue, have interpreted Supreme Court precedent to support the rule that repeal of a contested ordinance moots a plaintiff's injunction request, absent evidence that the City plans to or already has reenacted the challenged law or one substantially similar."); Weeks v. Connick, 733 F. Supp. 1036, 1037 (E.D. La. 1990).[3]

Under Texas law, statutes may be repealed expressly or by implication. See Gordon v. Lake, 356 S.W.2d 138, 139 (Tex. 1962). The Texas statutes that criminalized abortion (former Penal Code Articles 1191, 1192, 1193, 1194 and 1196) and were at issue in Roe have, at least, been repealed by implication. Currently, Texas regulates abortion in a number of ways. For example, a comprehensive set of civil regulations governs the availability of abortions for minors. See TEX. FAM. CODE §§ 33.002-011 (2000). Texas also regulates the practices and procedures of abortion clinics through its Public Health and Safety Code. See TEX. HEALTH & SAFETY CODE §§ 245.001-022; see also Women's Med. Center of Northwest Houston v. Bell, 248 F.3d 411, 414-16 (5th Cir. 2001) (discussing various portions of the Texas Abortion Facility License and Reporting Act). Furthermore, Texas regulates the availability of state-funded abortions. See 25 TEX. ADMIN. CODE § 29.1121 (2002); see also Bell v. Low Income Women of Tex., 95 S.W.3d 253, 256 (Tex. 2002).

---

[3] As noted above, an exception to this mootness rule exists where there is evidence, or a legitimate reason to believe, that the state will reenact the statute or one that is substantially similar. See City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289, 102 S. Ct. 1070, 1075 (1982); Northeastern Florida Chapter of Associated Gen. Contractors, 508 U.S. 655, 662, 113 S. Ct. 2297, 2301 (1993). This exception does not apply to the instant case. Texas has not adopted any substantially similar statute, nor is there a reasonable belief that it plans to reenact the statutory provisions struck down in Roe.

These regulatory provisions cannot be harmonized with provisions that purport to criminalize abortion. There is no way to enforce both sets of laws; the current regulations are intended to form a comprehensive scheme — not an addendum to the criminal statutes struck down in <u>Roe</u>. As the court stated in <u>Weeks</u>, a strikingly similar case, "it is clearly inconsistent to provide in one statute that abortions are permissible if set guidelines are followed and in another provide that abortions are criminally prohibited." 733 F. Supp. at 1038. Thus, because the statutes declared unconstitutional in <u>Roe</u> have been repealed, McCorvey's 60(b) motion is moot.[4]

## C. Evidentiary Hearing

Finally, the district court did not abuse its discretion in denying McCorvey's request for an evidentiary hearing. <u>See</u> <u>Moran v. Kingdom of Saudi Arabia</u>, 27 F.3d 169, 171 (5th Cir. 1994) (denial of evidentiary hearing affirmed where court had written

---

[4] The district court did not resolve the case on mootness grounds. Rather, the district court held that "McCorvey's 30-year delay is of such a great magnitude that her motion was not made within a reasonable time due to the length of time alone." Essentially, the district court concluded that a 30-year delay, regardless of the circumstances, is too long as a matter of law. We disagree. Rule 60(b)(5) and (b)(6) do not require the motion for relief from judgment be brought within a limited period of time. Instead, these provisions require only that the motion "be made within a reasonable time[.]" FED. R. CIV. P. 60(b). Therefore, "[w]hat constitutes a reasonable time under Rule 60(b) depends on the particular facts of the case in question." <u>Fed. Land Bank of St. Louis v. Cupples Bros.</u>, 889 F.2d 764 (8th Cir. 1989); <u>United States v. Wyle</u>, 889 F.2d 242, 249 (9th Cir. 1989) ("What constitutes a reasonable time depends on the facts of each case.") (citation and quotation omitted); <u>Holland v. Virginia Lee Co., Inc.</u>, 188 F.R.D. 241, 248 (W.D. Va. 1999) ([T]here is no set time period distinguishing timely from untimely motions outside of the absolute, one-year time frame for Rule 60(b)(1)-(3) motions."). Accordingly, the district court erred in initially determining that the 30-year delay was "unreasonable" without examining the facts and circumstances of this particular case. The district court did hold, in the alternative, that the 30-year delay was "unreasonable" under the "facts and circumstances" of the case. However, we need not reach that issue, which would require a substantive critique of McCorvey's claims, in light of our resolution of the matter on mootness grounds.

evidence sufficient to make its decision).  An evidentiary hearing would have served no useful purpose in aid of the court's analysis of the threshold questions presented, which, as we explained, precluded the relief McCorvey sought.

## CONCLUSION

For these reasons, rather than those articulated by the district court, the appeal from the district court's denial of McCorvey's Rule 60(b) motion for relief from judgment is **DISMISSED**.

EDITH H. JONES, Circuit Judge, concurring:


I agree that Ms. McCorvey's Rule 60(b) case is now moot. A judicial decision in her favor cannot turn back Texas's legislative clock to reinstate the laws, no longer effective, that formerly criminalized abortion.

It is ironic that the doctrine of mootness bars further litigation of this case. Mootness confines the judicial branch to its appropriate constitutional role of deciding actual, live cases or controversies. Yet this case was born in an exception to mootness[5] and brought forth, instead of a confined decision, an "exercise of raw judicial power." Doe v. Bolton, 410 U.S. 179, 222; 93 S. Ct. 762, 763, 35 L.Ed.2d 739 (White, J., dissenting) (1973). Even more ironic is that although mootness dictates that Ms. McCorvey has no "live" legal controversy, the serious and substantial evidence she offered could have generated an important debate over factual premises that underlay Roe.

McCorvey presented evidence that goes to the heart of the balance Roe struck between the choice of a mother and the life of her unborn child. First, there are about a thousand affidavits of women who have had abortions and claim to have suffered long-term

---

[5] See Roe v. Wade, 410 U.S. 113, 125; 93 S. Ct. 705, 713; 35 L.Ed.2d 147 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review'.") (citations omitted).

8

emotional damage and impaired relationships from their decision.[6]

Studies by scientists, offered by McCorvey, suggest that women may be affected emotionally and physically for years afterward and may be more prone to engage in high-risk, self-destructive conduct as a result of having had abortions.[7]  Second, Roe's assumption that the decision to abort a baby will be made in close consultation with a woman's private physician is called into question by affidavits from workers at abortion clinics, where most abortions are now performed.  According to the affidavits, women are often herded through their procedures with little or no medical or emotional counseling.[8]  Third, McCorvey contends that the

---

[6]     R. at 15-1410, Affidavits of More Than One Thousand Post-Abortive Women.

[7]     See R. at 1669-1718, Affidavit of David Reardon, Ph.D. (reporting on clinical and scientific findings demonstrating that abortion is linked to emotional, physical, and psychological problems in women and criticizing the studies relied on by the Roe Court).  See also C. A. Barnard, The Long-Term Psychosocial Effects of Abortion (Portsmouth, NH: Institute for Pregnancy Loss, 1990); W. Franz & D. Reardon, Differential Impact of Abortion on Adolescents and Adults, 27(105) Adolescence 161-72 (1992); M. Gissler, et al., Suicides after pregnancy in Finland: 1987-94: register linkage study, BMJ, 313:1431-4 (1996); B. Lask; J. Lydon, et al., Pregnancy Decision Making as a Significant Life Event: A Commitment Approach, 71(1) Journal of Personality and Social Psychology, 141-51 (1996); B. Major & C. Cozzarelli, Psychosocial Predictors of Adjustment to Abortion, 48(3) Journal of Social Issues, 48(3) 121-42 (1992); W. B. Miller, An Empirical Study of the Psychological Antecedents and Consequences of Induced Abortion, 48(3) Journal of Social Issues 67-93 (1992); W. B. Miller, Testing a Model of the Psychological Consequences of Abortion, The New Civil War:  The Psychology, Culture, and Politics of Abortion, (American Psychological Assoc., Linda J. Beckman & S. Maria Harvey, eds. Washington, DC, 1998); H. Söderberg, et al., Emotional distress following induced abortion: A Study of incidence and determinants among abortees in Malmö Sweden, 79 Eur. J. Obstet. Gynecol. Reprod. Biol. 173-78 (1998); H. P. Vaughan, Canonical Variates of Post Abortion Syndrome (Portsmouth, NH: Institute for Pregnancy Loss, 1990); Gail B. Williams, Induced Elective Abortion and Pre-natal Grief (cited by Reardon).

[8]     See, e.g., R. at 1721-57, Affidavit of David Reardon, Ph.D. (reporting, based on numerous studies, investigations and interviews, that women visiting abortion clinics receive little to no counseling (and what counseling is received is heavily biased in favor of having an abortion), are rushed through the process, and exposed — without sufficient warning — to health risks ranging from unsanitary clinic conditions to physical and psychological damage); R. at 1668-1804, Exhibits to Affidavit of David Reardon, Ph.D. (studies, full interviews, and other analysis supporting conclusions); R. 4308-5188 Client

sociological landscape surrounding unwed motherhood has changed dramatically since <u>Roe</u> was decided. No longer does the unwed mother face social ostracism, and government programs offer medical care, social services, and even, through "Baby Moses" laws in over three-quarters of the states, the option of leaving a newborn directly in the care of the state until it can be adopted.[9] Finally, neonatal and medical science, summarized by McCorvey, now graphically portrays, as science was unable to do 31 years ago, how a baby develops sensitivity to external stimuli and to pain much

Intake Records from Pregnancy Care Centers (cataloging the emotional, physical, and psychological symptoms felt by hundreds of women after having an abortion who then sought post-abortion counseling); R. at 5189-96 Affidavit of Carol Everett (written testimony of a former abortion clinic worker, reporting that, in her clinic, both abortion counselors and physicians worked on commission and aggressively followed a script to encourage prompt election of the procedure — even when the patient was not pregnant; that physicians usually performed 10 to 12 abortions per hour; that the clinic transported women to hospitals secretly by car when complications arose (to avoid bad publicity); and that she saw one woman die and 19 others permanently maimed by abortion procedures); R. at 10, Affidavit of Norma McCorvey (describing abortion facilities based upon her work experience in clinics).

[9] <u>See</u> ALA. CODE § 26-25-1 <u>et</u> <u>seq.</u> (2000); ARIZ. REV. STAT. § 13-3623.01 (2001); ARK. CODE ANN. § 9-34-202 (MICHIE 2001); CAL. HEALTH & SAFETY CODE § 1255.7 (DEERING 2000); COLO. REV. STAT. § 19-3-304.5 (2000); CONN. GEN. STAT. § 17a-57 <u>et</u> <u>seq.</u> (2000); DEL. CODE ANN. tit. 16 § 907A (2001); FLA. STAT. ANN. § 383.50 <u>et</u> <u>seq.</u> (<u>WEST</u> 2000); GA. CODE ANN. § 19-10A-1 <u>et</u> <u>seq.</u> (2002); IDAHO CODE § 39-8201 <u>et</u> <u>seq.</u> (2001); § 325 ILL. COMP. STAT. 2/1 <u>et</u> <u>seq.</u> (WEST 2001); IND. CODE § 31-34-2.5-1 <u>et</u> <u>seq.</u> (MICHIE 2000); IOWA CODE § 233.1 <u>et</u> <u>seq.</u> (2001); KAN. STAT. ANN. § 38-15,100 (2000); KY. REV. STAT. ANN. § 405.075 (2002); LA. CH. CODE ART. 1151 (WEST 2000); ME. REV. STAT. ANN. tit. 17-A § 553 (2002); MD. CODE ANN. CTS. & JUD. PROC. § 5-641 (2002); MICH. COMP. LAWS § 750.135 (2000); MINN. STAT. § 145.902 (2000); MISS. CODE ANN. § 43-15-201 <u>et</u> <u>seq.</u> (2001); MO. REV. STAT. § 210.950 (2002); Mont. Code Ann. § 40-6-401 <u>et</u> <u>seq.</u> (2001); N.Y. PENAL § 260.03; PENAL § 260.15; and, SOC. SERV. § 372-g (2000); N.C. GEN. STAT. § 7B-500 (2001); N.D. CENT. CODE § 50-25.1-15 (2001); OHIO REV. CODE ANN. § 2151.3515 <u>et</u> <u>seq.</u> (ANDERSON 2001); OKLA. STAT. tit. 10 § 7115.1 (2001); OR. REV. STAT. § 418.017 (2001); PA. STAT. ANN. tit. 23 § 6501 <u>et</u> <u>seq.</u> (2002); R.I. GEN. LAWS § 23-13.1-1 <u>et</u> <u>seq.</u> (2001); S.C. CODE ANN. § 20-7-85 (2000); S.D. CODIFIED LAWS § 25-5A-27 <u>et</u> <u>seq.</u> (MICHIE 2001); TENN. CODE ANN. § 68-11-255 (2001); TEX. FAM. CODE ANN. § 262.301 <u>et</u> <u>seq.</u> (WEST 1999); UTAH CODE ANN. § 62A-4a-801 <u>et</u> <u>seq.</u> (2001); WASH. REV. CODE § 13.34.360 (2002); W. VA. CODE § 49-6E-1 <u>et</u> <u>seq.</u> (2000); WIS. STAT. ANN. § 49.195 (WEST 2001); WYO. STAT. ANN. § 14-11-101 <u>et</u> <u>seq.</u> (MICHIE 2003).

earlier than was then believed.[10]  In sum, if courts were to delve into the facts underlying <u>Roe</u>'s balancing scheme with present-day knowledge, they might conclude that the woman's "choice" is far more risky and less beneficial, and the child's sentience far more advanced, than the <u>Roe</u> Court knew.

This is not to say whether McCorvey would prevail on the merits of persuading the Supreme Court to reconsider the facts that motivated its decision in <u>Roe</u>.[11]  But the problem inherent in the Court's decision to constitutionalize abortion policy is that, unless it creates another exception to the mootness doctrine, the Court will never be able to examine its factual assumptions on a record made in court.  Legislatures will not pass laws that challenge the trimester ruling adopted in <u>Roe</u> (and retooled as the "undue burden" test in <u>Casey</u>; <u>see</u> <u>Casey</u>, 505 U.S. at 872-78, 112 S. Ct. at 2817-21).  No "live" controversy will arise concerning this framework.  Consequently, I cannot conceive of any judicial forum in which McCorvey's evidence could be aired.

At the same time, because the Court's rulings have rendered basic abortion policy beyond the power of our legislative

_____

[10]    <u>See</u> R. 5197-5347 (submissions from numerous individuals, each holding an MD or PhD, reporting that unborn children are sensitive to pain from the time of conception, and relying on peer-reviewed, scientific journals).  <u>See, e.g.</u>, Mann et al., <u>Prevention of Allogeneic Fetal Rejection by Tryptophan Catabolism</u>, 281 Science 1191 (1998); P.W. Mantyh, <u>Inhibition of Hyperalgesia by Ablation of Lamina I Spinal Neurons Expressing the Substance P Receptor</u>, 278 Science 275 (1997)(cited by Dr. David Fu Chi Mark, Ph.D).

[11]    Indeed, the Court seems disinclined ever to reconsider the facts, especially since in <u>Casey</u>, the Court's determinative plurality opinion refuses to justify <u>Roe</u> on its own terms and states conclusionally that "no change" in regard to the viability of a fetus's life "has left [<u>Roe</u>'s] central holding obsolete."  <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>, 505 U.S. 833, 860, 112 S. Ct. 2491, 2812, 120 L.Ed.2d 674 (plurality opinion) (1992).

bodies, the arms of representative government may not meaningfully debate McCorvey's evidence. The perverse result of the Court's having determined through constitutional adjudication this fundamental social policy, which affects over a million women and unborn babies each year, is that the facts no longer matter. This is a peculiar outcome for a Court so committed to "life" that it struggles with the particular facts of dozens of death penalty cases each year.

Hard and social science will of course progress even though the Supreme Court averts its eyes. It takes no expert prognosticator to know that research on women's mental and physical health following abortion will yield an eventual medical consensus, and neonatal science will push the frontiers of fetal "viability" ever closer to the date of conception. One may fervently hope that the Court will someday acknowledge such developments and re-evaluate <u>Roe</u> and <u>Casey</u> accordingly. That the Court's constitutional decisionmaking leaves our nation in a position of willful blindness to evolving knowledge should trouble any dispassionate observer not only about the abortion decisions, but about a number of other areas in which the Court unhesitatingly steps into the realm of social policy under the guise of constitutional adjudication.